**PUBLISHED**

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **13th** *day of* **May, 2025**.

Terence Jerome Richardson, s/k/a
  Terrence Jerome Richardson,                                                                    Petitioner,

 against                        Record No. 0361-21-2

Commonwealth of Virginia,                                                                     Respondent.


Upon a Petition for a Writ of Actual Innocence

Before Judges Beales, O'Brien, and Fulton


Terence Jerome Richardson, by counsel, filed with this Court a Petition for a Writ of Actual Innocence Based on Nonbiological Evidence, pursuant to the provisions of Chapter 19.3 of Title 19.2 of the Code of Virginia. By final order entered on March 8, 2000, and in accordance with his guilty plea, the Circuit Court of Sussex County convicted Richardson of involuntary manslaughter for the death of Waverly Police Officer Allen W. Gibson, Jr. The circuit court sentenced Richardson to ten years of incarceration, with five years suspended.

Richardson contends that he is innocent of the felony offense for which he was convicted. In support of his claim, Richardson presents (1) a "handwritten statement of an eyewitness," Shannequia Gay, in which the then-nine-year-old girl reportedly "identified the perpetrator as a man with dreads wearing a white t-shirt"; (2) a "photo array identification procedure conducted by state investigators," during which Shannequia Gay purportedly "identif[ied] a man named Leonard Newby as the 'man with dreads'"; and (3) an anonymous "911 call to the Sussex County hotline identifying Leonard Newby as the perpetrator." Richardson asserts that the proffered materials establish his innocence.

The Commonwealth, originally represented by Attorney General Mark R. Herring, initially filed a response joining Richardson's petition or, in the alternative, requesting that this Court order an evidentiary hearing in the Circuit Court of Sussex County. The Commonwealth, now represented by Attorney General Jason S. Miyares, later filed a supplemental response opposing Richardson's petition and moving this Court

to dismiss Richardson's petition. Richardson's counsel then filed a reply to the Commonwealth's supplemental response and its motion to dismiss. We held oral argument on Richardson's petition and, after considering Richardson's petition, the Attorney General's responses, Richardson's reply, and the record before this Court, we dismissed the petition without ordering an evidentiary hearing. *Richardson v. Commonwealth*, 75 Va. App. 120 (2022).

Richardson then appealed to the Supreme Court of Virginia, and the Supreme Court directed that this case requires further development of the facts. *Richardson v. Commonwealth*, No. 220499, 2024 Va. Unpub. LEXIS 1, at *3 (Va. Feb. 1, 2024). In accordance with the Supreme Court's order, we partially vacated our previous order "as to this Court's decision to dismiss this matter without an evidentiary hearing, but not as to this Court's ruling to allow the Commonwealth to file a brief that contradicted its initial brief."[1] *Richardson v. Commonwealth*, 80 Va. App. 359 (2024). We then remanded this matter to the circuit court to conduct an evidentiary hearing and to certify findings of fact. *Id.* at 360; *see also* Code § 19.2-327.12.

The circuit court conducted an evidentiary hearing and supplied this Court with its certified findings of fact. We then directed the parties to file supplemental briefs addressing the circuit court's findings from the evidentiary hearing. The parties subsequently filed their respective supplemental briefs. Richardson's counsel also moved this Court to expand the record to include materials "that he discovered while preparing for his evidentiary hearing and in the weeks following the hearing."[2] We then again held oral argument, this time for the parties to address the circuit court's findings from the evidentiary hearing—as well as the pending motions in this matter, including the additional materials proffered by Richardson's counsel.

---

[1] The Supreme Court affirmed this Court's holding that a party in an actual innocence matter must be able to change its position—without being said to approbate and reprobate—because the additional evidence that comes forward, for example, may require the Commonwealth to change its position. *Richardson*, 2024 Va. Unpub. LEXIS at *6.

[2] For purposes of this matter presently before this Court, we will assume without deciding that this Court has the authority to grant Richardson's motion to expand the record and to consider all of the materials in that expanded record, which we hereby consider.

Upon review of all the pleadings, the circuit court's clearly stated findings of fact and credibility from the 2024 evidentiary hearing, and the extensive record now before this Court, we hold that Richardson is not entitled to a writ of actual innocence. Consequently, we must dismiss his petition.

## I. BACKGROUND

### A. The Evidence Presented in the Circuit Court

Trooper Thomas Jarrid Williams of the Virginia State Police testified under oath at the October 15, 1998 preliminary hearing in the Sussex County General District Court that on Saturday, April 25, 1998, "around 11:14 that morning," he responded to a dispatch call regarding "an officer being shot behind the Waverly Village Apartments." When he arrived at the apartment complex "approximately five to seven minutes later," he saw "a large crowd of people out in front of the apartments," including Waverly Chief of Police Warren Sturrup, who was "out in the front parking lot talking to the people" and "running around asking questions." Chief Sturrup informed Trooper Williams that the fallen officer was "behind the apartments in the woods." Trooper Williams then "ran back to the woods behind the apartments," where he saw Corporal Rick Aldridge of the Sussex County Sheriff's Office "on his knees holding" Officer Allen W. Gibson, Jr.

Trooper Williams stated that Officer Gibson "was laying on the ground" and that "his uniform shirt was opened up," and he noticed that Officer Gibson's "color was gray" and "[s]omewhat ashen." He also noticed "what appeared to be a bullet hole" about "an inch above his navel," and that Officer Gibson's "eyes were open at the time and he was talking very slowly to Cpl. [Corporal] Aldridge." Trooper Williams testified that he then "got down beside of" Officer Gibson and reassured him "that he was going to make it." According to Trooper Williams, Officer Gibson implored him to "please don't leave me," and he repeatedly stated that "he wasn't going to make it, that he was dying." As Officer Gibson's "condition was worsening," he told Trooper Williams that "everything was getting blurry," that "his legs were starting to go numb," and that "he was going to pass out." Officer Gibson also asked Trooper Williams "to tell his family that he loved—that he loved 'em."

-3-

Trooper Williams went on to recount:

> I asked him, I said Allen, who did this to you? He stated that there were two black males. One sort of medium build with short, balding hair. Real short, narrow. He described one as tall and skinny. He described one of them with hair that would resemble dreadlocks pulled back into a pony tail. He said they were both wearing dark jeans. One of them had on a white T-shirt. One of them had on an old blue baseball cap. He said that he had got in a scuffle with them and one of them got his gun. He referred to the one that had the gun as the skinny one. He said that he was fighting with him and he was—he was trying to move his hands and show me. He said I tried to move the gun away from me and he said they shot me with my own gun.

Officer Gibson also told Trooper Williams that

> he chased—chased a black male into the woods, or he saw one back into the woods, and he talked like that he was trying to arrest one of 'em, or trying to subdue one of 'em, and then he got in a rassling—just, you know, got into a scuffle with both of 'em. And that one of them got his gun and that they shot him with it.[3]

Realizing that Officer Gibson "was in bad shape and that he needed to—to get to a hospital as soon as possible," Trooper Williams called the dispatcher and "advised them to get the helicopter on the way." The rescue squad soon arrived and "started tending to" Officer Gibson. Trooper Williams rode in the ambulance with Officer Gibson "to the Waverly Police Department where MedFlight was to land." He noted that Officer Gibson

> called out again the description. He several times during—more than twice told me the description of the two people. When he thought he was going to pass out he would call out that description again. I was fighting with two black males, one skinny, one medium build with short, balding hair, one with dreadlocks, old blue baseball cap, white T-shirt. The skinny one had a white T-shirt on. He kept calling that out. And every time that he would feel that he was going to pass out, or he would pass out, he would call out that description again. And at that time, while we were sitting in front of the Waverly Police Department, as the helicopter landed Allen went into cardiac arrest.

---

[3] Corporal Aldridge informed Trooper Williams that Officer Gibson's "gun was laying in front of him" and that "Chief Sturrup had the gun" before Corporal Aldridge "could tell him don't touch that, leave it alone." Chief Sturrup later acknowledged that he improperly picked up Officer Gibson's gun before it could be examined for any evidence such as fingerprints or DNA evidence.

-4-

Officer Gibson was then taken by helicopter to a hospital in Petersburg, where he died that same afternoon from his injuries.

Shawn Wooden, who described himself as "a friend" of Terence Richardson "from about five years ago," also testified under oath at the preliminary hearing. Wooden testified that Richardson stayed with him "for about a week or so" in April 1998, including on the date of Officer Gibson's shooting. Wooden recounted that on Saturday, April 25, 1998, he and Richardson met Ferrone Claiborne in Waverly because they were "supposed to go to Petersburg to get some drugs."[4] However, Claiborne informed them that "we didn't have to go to Petersburg then, that he could get it now," so the three men instead went to the Waverly Village Apartments to "meet somebody" to "get some drugs from 'em." Wooden recalled that Richardson "had on some jeans and a light shirt with a marijuana plant on the front," and "he had another shirt like over top of it, a plaid shirt."

When the three men arrived at the apartment complex, Claiborne told Wooden that he and Richardson were "going to meet a guy in the back" of the complex. Richardson and Claiborne then "went around the back of the—the back apartment, the one near the wooded area," while Wooden stayed closer to the entrance of the apartment complex to be a lookout and "make a holler or something if I see somebody come." After losing sight of Richardson and Claiborne, Wooden noticed a Waverly police car pull up and stop at the apartment complex. Wooden saw an officer get out of the police car and head toward "the last apartment that's near the woods"—the same area where Richardson and Claiborne had gone. Wooden recognized the young officer from a prior interaction. Wooden stated that he then "screamed" out the signal "[s]koo doo" to

---

[4] Claiborne was Richardson's co-defendant at the preliminary hearing, and he ultimately pleaded guilty to being an accessory after the fact in the killing of Officer Gibson by involuntary manslaughter. At the time of Claiborne's conviction, Code § 18.2-19 provided that "every accessory after the fact shall be guilty of a Class 1 misdemeanor." Claiborne also filed with this Court a petition for a writ of actual innocence to challenge his misdemeanor conviction, which we dismissed for lack of jurisdiction because "the General Assembly plainly limited eligibility for the writ to those convicted of felony offenses in Virginia state courts." *Claiborne v. Commonwealth*, No. 0360-21-2 (Va. Ct. App. June 21, 2022) (order); *see also* Code § 19.2-327.10.

warn Richardson and Claiborne of the approaching officer. He then saw Richardson "look around the corner of the building," but he did not see Claiborne.

Wooden went on to recount that as he began quickly to leave the apartment complex, he heard "[a] gunshot." He stated, "After I heard the gunshot I just took off on the bike" for "my grandmother's house" near the apartment complex. When he realized that nobody was at his grandmother's house, however, he went back to his own home. Wooden then received a phone call from a woman who told him "something about a police being shot or something." Shortly thereafter, Richardson arrived back at Wooden's home without Claiborne. Wooden noticed that Richardson "looked nervous," and when Wooden "asked him then did they get the stuff," Richardson replied, "No." Wooden then received another phone call from a woman who was looking for one of Wooden's neighbors. The neighbor came to Wooden's home to take the phone call, and the woman on the other line began telling the neighbor about "what had happened" with the police officer who had just been shot. Wooden noted that when the neighbor asked the woman on the phone "what police got shot," Richardson "said it was a new cop"—even though Richardson "couldn't hear the conversation on the telephone."

Wooden testified that "at that point, um, I started thinking, well, didn't nobody, you know, know who was shot, so how would he [Richardson] know. So then he told me, um, he wanted to talk to me." Wooden stated that he and Richardson then "went out on the front deck in the front of my trailer and we stood there and talked. And then he just said it was an accident." Wooden recalled that Richardson told him "[t]hat he [Richardson] accidentally shot the cop, and if I tell anybody, something will be done to me and my family. So that's why I never said anything." Wooden noted that Richardson "looked nervous then, and you could tell it was true, 'cause you know, the look he had in his eyes. Like you know, he was scared and like he was sorry, you know. Like he was worried." He further recounted that Richardson told him:

> Just not to say anything to anybody. You know. So—or something would happen. So then I went outside to the—back in the house. Then went out the back door to the clothesline where my girlfriend [Javona Jones] was at. And, um, you know, was talking to her about it. So I told her, you know, she couldn't say nothing, you know, about it because, you know, what might

-6-

happen and stuff. So he [Richardson] just stayed around. You know. Just stayed around the house, and every time I left he left with me. And wherever we went.

On cross-examination, Wooden acknowledged that he initially told the police that he and Richardson had spent the night at his home the night before the shooting, that he and Richardson awoke around noon the day of Officer Gibson's shooting, and that they "didn't know anything" about the shooting. He testified under oath, however, that his initial statement to the police "was false" and that he was now "telling the truth" under oath at the preliminary hearing. Wooden also acknowledged that he had mentioned a man named Leonard Newby to the police as a potential suspect because "that's the only person I could think about other than Terence that had dreads. Or plaits in their head." He noted that he also gave the police Newby's name "[b]ecause other people were mentioning his name."

On November 10, 1998, following the preliminary hearing, a Sussex County grand jury indicted Richardson for capital murder. The prosecution later amended Richardson's indictment by reducing the capital murder offense to involuntary manslaughter. Richardson, who retained experienced criminal defense attorney David E. Boone, subsequently pleaded guilty to the reduced felony charge of involuntary manslaughter.

At Richardson's plea hearing on December 8, 1999, the Circuit Court of Sussex County conducted the required plea colloquy. Richardson answered to the judge's satisfaction each question asked, including:

- "Are you the person charged in the indictment" and "[d]o you understand that charge?"

- "Have you discussed with Mr. Boone what must be proven in order for you to be found guilty?"

- "Have you discussed with him whether you should plead guilty or not guilty?"

- "After that discussion, was it your decision that you plead guilty?"

- "Are you entering that plea freely and voluntarily" "[b]ecause you are in fact guilty?"

- "Do you understand that when you plead guilty, you waive your right to trial by jury," "to confront any witness who may testify against you," and "to remain silent?"

- "Has anyone connected with your arrest and prosecution, such as the Commonwealth's Attorney or the police, forced you in any way to enter this plea of guilty?"

- "Have you discussed with Mr. Boone what the maximum punishment for this crime is?"

- "Are you entirely satisfied with his services?"

- "Do you understand that by entering this plea, you may waive your right to appeal the decision of the Court?"

- "Do you understand all the questions I've asked of you?"

J. David Chappell, the Commonwealth's Attorney of Sussex County at that time, proffered (without objection or amendment from Richardson's defense counsel, David E. Boone) the evidence the prosecution would have presented at trial. Chappell proffered that on the morning of Saturday, April 25, 1998, Officer Gibson "was patrolling in the Waverly Village Apartment area of Waverly" when he was shot and later died "at approximately 2:30 p.m." that same day from "a gunshot wound to his abdomen." Chappell stated that Shawn Wooden would testify that "Richardson was staying with him at the time of the offense" and that he, Terence Richardson, and Ferrone Claiborne went to "get some dope" at "the Waverly Village Apartments" that Saturday morning. Wooden would recount that Richardson and Claiborne "went to the back of the apartment complex" while he "was instructed to be a lookout if he saw anything that occurred." Wooden then saw "Officer Gibson pull[] up at that general time frame," at which point Wooden gave "an audible signal," prompting Richardson and Claiborne to "run behind the complex into a wooded area behind the apartment complex." He then "heard what he thought was a shot ring out" before he "left the area" and "went back to his house." "Approximately fifteen minutes later," Richardson "came back to the house looking out of breath, nervous, and concerned," and Richardson later "took him [Wooden] outside and indicated to him that Terence Richardson had shot, accidentally shot the cop." Chappell noted that Wooden's girlfriend, Javona Jones, "would corroborate in many respects the testimony of Shawn Wooden."

-8-

Chappell further proffered that Corporal Rick Aldridge would testify that he "came to the apartment complex about 11:30 a.m. that morning and got the message that an officer was down." When Corporal Aldridge "reached the area in the back of the complex, he saw Officer Gibson lying on the ground," and he noticed that Officer Gibson "was in and out of consciousness." Corporal Aldridge would also testify that he "observed a wound in the abdomen area of Officer Gibson around his navel." Furthermore, Corporal Aldridge would recount that Officer Gibson provided "a description of the assailant/assailants, indicating they were wearing blue jeans and white shirts and that one had dreadlocks," and that "the tall, thin one wrestled with him over his gun when the gun went off."

In addition, Chappell proffered that Trooper Thomas Jarrid Williams would testify that he "also came to the scene shortly after Officer Gibson was shot" and that he "also noticed a hole, a bullet hole about one inch above Officer Gibson's navel." Trooper Williams would testify that Officer Gibson, who "believed he was dying," provided "other identifying information on his assailants"—including that "one was tall and skinny with dreadlocks," while the "other was short with bald on top hair." Trooper Williams would recall that Officer Gibson told him that "he had chased a black male into the woods and got into a scuffle with two black males who were attempting to get his gun" and that "he was fighting with the tall, skinny one. The tall, skinny one got the gun and the gun just went off."

Finally, Chappell proffered that Ann Jones, a forensic scientist, would testify that "the bullet involved was from Officer Gibson's duty service revolver" and that "only one shot was fired"—although "[t]here were other bullets from the firearm that were not fired." The forensic scientist would further testify that "through examination of the hole in the front panel of Officer Gibson's shirt" and "the gunshot residue," she "was able to determine" that "the distance of the pistol to Officer Gibson's body was less than an arm's length" and "could have been as close as three inches from Officer Gibson's body"—although it was "more likely" that "it was between six and twelve inches from his body."

Without objection from Richardson's defense counsel, the prosecution introduced into evidence Officer Gibson's autopsy report, the certificate of analysis from the forensic scientist, and the full transcript of

-9-

the preliminary hearing, including the full sworn testimony of Trooper Williams and Shawn Wooden. When asked by the circuit court judge, "[W]ould you agree that if tried, the recitation of Mr. Chappell would be the Commonwealth's evidence," Richardson's defense counsel replied, "Yes, Judge."

After conducting the required plea colloquy and hearing the evidentiary proffer from the Commonwealth's Attorney, the circuit court accepted Richardson's guilty plea and found Richardson guilty of the felony offense of involuntary manslaughter. The circuit court judge stated that the court "finds the plea of guilty to be freely, intelligently, and voluntarily entered with an understanding of the plea and its consequences"—and that the court "[a]ccepts the plea at this time, finding the defendant guilty as charged in the indictment." Following the sentencing hearing on March 8, 2000, the circuit court sentenced Richardson to ten years of incarceration, with five years suspended.

### B. Richardson's Federal Court Proceedings

In December 2000, a federal grand jury indicted Richardson on one count of conspiracy to distribute a controlled substance ("crack" cocaine), in violation of 21 U.S.C. § 846; one count of using a firearm to commit murder during drug trafficking, in violation of 18 U.S.C. § 924(c) and (j); and one count of murder of a law enforcement officer during drug trafficking, in violation of 21 U.S.C. § 848(e)(1)(B). Following a jury trial in the U.S. District Court for the Eastern District of Virginia, Richardson was convicted of conspiracy to distribute a controlled substance, but he was acquitted of the other two charges.[5]

At the federal sentencing hearing, then-Assistant U.S. Attorney David J. Novak argued that by pleading guilty to involuntary manslaughter in the Circuit Court of Sussex County, "Richardson has admitted that he participated in this killing" of Officer Gibson. The Assistant U.S. Attorney asked the federal district court to apply the sentencing enhancement provision provided by the federal sentencing guidelines for "the

---

[5] Claiborne was indicted on the same federal charges, and he was tried in the same federal jury trial as Richardson. Claiborne was also convicted of conspiracy to distribute a controlled substance, but, like Richardson, he was acquitted of the other two charges.

-10-

unlawful killing of a human being with malice aforethought" perpetrated in furtherance of a felony drug trafficking offense. *See* USSG § 1B1.3 comment., backg'd.

After hearing argument from the parties, the federal district court found that "the guilty pleas in the state courts constitute judicial admissions of participation in the event and presence at the event." The federal district court explained that

> the fact of the matter is there was admitted into evidence the statement of facts and the text of the guilty pleas, and in both of those instances, these defendants admitted being present and participating in one way or another, albeit different than what is accused here by the United States in the killing of Officer Gibson.

The federal district court also found "by clear and convincing evidence that this killing of another was with malice aforethought," and the court concluded that the sentencing enhancement did apply to Richardson's case "by virtue of the ruling in *United States v. Watts* and it[]s progeny"—which increased Richardson's maximum sentence to life imprisonment.[6] Emphasizing that Richardson "trafficked in significant quantities of drugs" and "engaged in conduct" that resulted "in the death of a police officer," the federal district court sentenced Richardson to life imprisonment.[7]

Richardson then appealed his federal case to the U.S. Court of Appeals for the Fourth Circuit, which affirmed the federal district court's ruling on Richardson's conviction and sentence. *United States v. Richardson*, 51 Fed. Appx. 90 (4th Cir. 2002). The Fourth Circuit concluded that "the district court did not commit clear error in finding that Appellants killed Officer Gibson" because the "district court based this finding on Gibson's reasonably accurate description of the Appellants as his assailants, the corroborating testimony of Wooden and another eyewitness, Appellants' guilty pleas in state court, and their false alibis"— all of which "amply support the finding that Appellants murdered Gibson." *Id.* at 94. The U.S. Supreme Court denied Richardson's petition for a writ of certiorari, *Richardson v. United States*, 537 U.S. 1240

---

[6] In *United States v. Watts*, 519 U.S. 148, 157 (1997), the U.S. Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *See* 18 U.S.C. § 3661.

[7] The federal district court also sentenced Claiborne to life imprisonment.

-11-

(2003), and Richardson's post-conviction habeas proceedings in federal court were also unsuccessful, *United States v. Claiborne*, 388 F. Supp. 2d 676 (E.D. Va. 2005); *United States v. Richardson*, 169 Fed. Appx. 792 (4th Cir. 2006); *Richardson v. United States*, 2007 U.S. LEXIS 429 (U.S. Jan. 8, 2007).  Richardson later submitted a request for executive clemency to President Barack H. Obama, but his request for executive clemency was not granted.  However, on January 17, 2025, President Joseph R. Biden, Jr., commuted Richardson's federal sentence but did not grant him a pardon.[8]

C. Richardson's Petition for a Writ of Actual Innocence

In his petition for a writ of actual innocence now before this Court, Richardson, through counsel, presents three pieces of evidence to support his claim of innocence.[9]

First, Richardson relies on a "handwritten statement of an eyewitness, Miss Shannequia Gay ('Miss Gay'), who identified the perpetrator as man with dreads wearing a white t-shirt."  Richardson maintains, "I wore my hair in cornrows at the time."  The document purports to be the "statement of Shannequia Gay given on 4-25-98 at 9:46 pm," and it contains the signatures "Shannequia Gay," "Sharon Gay Turner," "Greg Russell," "SAA Stevens," and "Dep V.P. Ricks."  The document provides:

> My cousin and I were watching the T.V. show "Recess."  The first part of the show had gone off.  My aunt told me to go outside and play with "Quay."  He is my three year old cousin.  We were riding bikes that's when I saw Eric walking behind Evettes house.  I know his name is Eric because someone called out his name when he was going behind Evettes and he turned around.  They called Eric from Hope's house.  After they called Eric—he[,] Eric, yelled back

---

[8] President Biden's executive grant of clemency commuted "the total sentence of imprisonment" for Richardson's conviction in federal court that he "is now serving to expire on July 16, 2025."  The executive grant of clemency left "intact and in effect the term of supervised release imposed by the court with all its conditions and all other components of the sentence."  President Biden also commuted Claiborne's sentence for his conviction in federal court.  It is well-established that the President's power to grant clemency, however, does not extend to convictions in state courts.  U.S. Const. Art. II, § 2 cl. 1 (providing that the President "shall have Power to grant Reprieves and Pardons for Offences against the United States").  Thus, President Biden's executive grant of clemency has no bearing on Richardson's petition for a writ of actual innocence now before this Court for his involuntary manslaughter conviction in Virginia in the Circuit Court of Sussex County.

[9] In addition, in his brief in support of his petition, Richardson contends that "no rational trier of fact would have found proof of guilt beyond a reasonable doubt" as he "was subject to a federal investigation and prosecution for the same exact offense and was acquitted of the crime of murder."

-12-

to the guy at Hope's that he would "meet him around the other side." Eric told the guy that he was going to get a lawnmower from his grandmother. Eric went behind Evettes and then I didn't see him.

A couple of minutes went by then a police officer drove up and parked in front of Evettes. He got out of the car and walked behind Evettes house. He was just looking around down at the ground. He had something in his hand. He picked it up and talked in it. I couldn't hear what he said but someone talked back to him but I don't know what the other person said either. The policeman started walking back around the building kind of like he was going back to his car. That's when I saw the man with the "dreads" peeking around the other end of the building. He was watching the policeman. I'm not sure what kind of clothes he had on but I know he had a white shirt. He was kind of fat and he had hair on his chin. The guy with "dreads" ran back towards the woods when he saw the police. The police started running towards the woods too, I think he saw the man with the "dreads." I saw the police put his radio on his hip I think, I know he didn't have the radio in his hand. The police went to the hill and started walking real slow he had pulled his gun, it was in his right hand and it was pointed toward the sky. He had both hands on his gun. The man with the "dreads" had already gone into the woods. The policeman was on his tiptoes walking real slow. He went into the woods too. When the policeman went into the woods I heard something loud, it scared me but my cousin "Quay" went towards the noise. We got to the hill and I grabbed "Quay" and his bike. I saw the police on the ground with blood on his stomach. I heard something running through woods. I looked at the policeman and I saw a radio in his left hand. His right hand was shaking. The noise I heard in the woods was the guy with the "dreads." He had blood on his shirt. Both me and "Quay" got off of the hill as fast as we could. I knew that "Quay" had forgotten his bike, so I turned around and was thinking about going to get it. But that's when I saw the guy with "dreads" come back up the hill. He was looking all around. I saw the blood on his shirt again and he also had blood on his hands. He had something in his hands it could have been a bottle or a gun I'm not sure but it was pointing down and it was in his right hand. He then ran back down the hill back where the police was on the ground. After the guy with the "dreads" went back down the hill I ran over and got "Quay's" bike and I went inside.

When I heard the loud noise that scared me I heard the police calling for help, he said "help" a couple of times and that's all he said[.]

In his petition, Richardson states, "In November 2007, I became aware of the existence of the handwritten statement of Miss Shannequia Gay."

Second, Richardson relies on a "photo array identification procedure conducted by state investigators with Miss Gay identifying a man named Leonard Newby as the 'man with dreads.'" The "photo array" includes 12 photographs (in black and white) depicting the silhouette of a head and upper torso of a person in

each photograph. Individual facial features and other identifying characteristics, however, are simply not visible in these photographs. Beneath one of the photographs in position "2" are the initials "SG," the date "4/25/98," the time "1159," additional initials "TS," and the signature "Shannequia Gay." In his petition, Richardson states, "In May 2020, I became aware of the photo identification procedure where Miss Gay identified Leonard Newby as the 'man with dreads.'"

Third, Richardson relies on a "911 call to the Sussex County hotline identifying Leonard Newby as the perpetrator." Although there is no recording of the "911 call" in the record, Richardson provides a handwritten note dated "4-30-98" in which an unknown individual wrote:

> State Police message on answering machine[.] A male caller called in and stated Leonard Newby was involved and has cut his dreds [*sic*]. H. Dickerson also involved had dreds [*sic*] but has since cut them off. Tony White who is the boyfriend of Evette Newby were [*sic*] involved in the shooting of the officer.

In his petition, Richardson states, "In November 2020, I became aware of the 911 call identifying Leonard Newby as the perpetrator."

Richardson contends in his petition that "[t]he evidence was previously unknown to either me or my attorney at the time the conviction became final in the Circuit Court"—and that "[t]he evidence could not have been discovered or obtained by the exercise of diligence before the expiration of 21 days following entry of the final order of conviction." He further contends:

> The evidence upon which I based my claim is material and, when considered with all of the other evidence in the record, will prove that no rational trier of fact would have found me guilty or delinquent beyond a reasonable doubt of the charge(s) described above because had the evidence been available, my counsel would have never advised me to take a guilty plea.

The Commonwealth—which was then represented by Attorney General Mark R. Herring—responded to Richardson's petition in accordance with Code § 19.2-327.11(C) and initially took the position that "the federal trial and acquittal is material and that this is sufficient and dispositive in this matter." The Commonwealth argued at that time that this Court should grant Richardson's petition or, in the alternative, order an evidentiary hearing. The Commonwealth—which is now represented by Attorney General Jason S.

Miyares—subsequently sought leave of this Court on February 7, 2022, to file a supplemental brief and supplemental exhibits because "the Commonwealth no longer adheres to certain arguments contained in its previously filed brief." The Commonwealth noted that "it possesses approximately 15 transcripts of interviews conducted by the CIU [Conviction Integrity Unit] in this case that do not appear to have been provided to the Court or opposing counsel" by the former Attorney General—and that "[t]his material information should have been part of the evidence submitted to this Court" in the then-Attorney General's initial response to Richardson's petition on behalf of the Commonwealth.

In its supplemental brief opposing Richardson's petition, the Commonwealth asked this Court to dismiss Richardson's petition without ordering an evidentiary hearing, arguing that Richardson "has failed to prove that the proffered evidence he attributes to Gay and Newby is newly discovered within the meaning of Code § 19.2-327.11(A)(iv)(a)." Among the supplemental exhibits that the Commonwealth attached to its brief in opposition to Richardson's petition (that the Commonwealth noted had not been earlier provided to this Court) are (1) a copy of the subpoena dated November 5, 1999, for Shannequia Gay to testify before the Circuit Court of Sussex County at Richardson's upcoming trial scheduled for December 8, 1999; and (2) the proof of service indicating that Shannequia Gay's father, James E. Turner, was served with the subpoena for his daughter (who was then a juvenile) on November 12, 1999, and showing that the subpoena was returned to the Clerk's Office of the Circuit Court of Sussex County on November 19, 1999, to be filed in the case file for Richardson's upcoming trial scheduled for December 8, 1999.

Richardson's counsel filed a reply to the Commonwealth's supplemental brief and submitted additional documentary evidence and records from Richardson's federal proceedings. Richardson asked this Court "to strike the Commonwealth's Supplemental Brief and confine it to the position that it first adopted: that Mr. Richardson should be granted a writ of actual innocence." He also asked this Court to grant his petition or, in the alternative, "should the Court believe further factual development is necessary, Mr. Richardson requests that his case be remanded to the Circuit Court for an evidentiary hearing" pursuant to Code § 19.2-327.12.

D. The Subsequent Proceedings on Richardson's Petition

This Court held oral argument on Richardson's petition on May 6, 2022. By order entered on June 21, 2022, this Court dismissed Richardson's petition without ordering an evidentiary hearing.[10] *Richardson*, 75 Va. App. 120. This Court found that Richardson failed to satisfy the diligence requirement under Code § 19.2-327.11(A)(iv)(a) of the actual innocence statute because "the record shows that Richardson and his trial counsel had ample time to investigate the subpoena" served on Shannequia Gay, "to talk to Shannequia about what she saw, or to work with her parents to do so—all before Richardson's conviction became final." *Id.* at 136. This Court also found,

> Because we have concluded that the exercise of diligence would have revealed Shannequia Gay's role as a witness in this case, we similarly conclude that the exercise of diligence for purposes of Code § 19.2-327.11(A)(iv)(a) would have revealed the purported photo identification of a possible alternate suspect made by the very same witness later in the day of Officer Gibson's killing.

*Id.* at 138. This Court further found that "Richardson has failed to show by a preponderance of the evidence that the 911 message is 'material' within the meaning of Code § 19.2-327.11(A)(vii), because he has not shown that the content of the message is true." *Id.* at 140. In addition, this Court concluded that "Richardson's federal acquittals fail to establish that 'no rational trier of fact' would have found him guilty of involuntary manslaughter as required by Code § 19.2-327.11(A)(vii)" because "[t]he federal jury's verdict that Richardson was not guilty of an intentional killing or a killing with malice aforethought simply does not prove that Richardson is actually innocent of the *accidental* killing to which he pled guilty in the Circuit Court of Sussex County." *Id.* at 141 (emphasis in original).

Richardson appealed this Court's decision to the Supreme Court of Virginia. By order entered on February 1, 2024, the Supreme Court held:

---

[10] In so ruling, this Court stated, "We do not agree with Richardson's argument that the Court must disregard the supplemental exhibits and supplemental pleadings that were submitted to the Court for our consideration in this matter." *Richardson*, 75 Va. App. at 132 n.5. This Court determined, "The Commonwealth's supplemental pleadings and Richardson's reply are all part of the record now before us." *Id.*

> Without taking any position on the merits of Richardson's petition, the Court is of the opinion that the Court of Appeals abused its discretion when it refused to grant his request for an evidentiary hearing. Accordingly, the decision of the Court of Appeals dismissing Richardson's petition is reversed and the case is remanded to the Court of Appeals for the purposes of ordering an evidentiary hearing to permit Richardson the opportunity to demonstrate whether reasonable diligence was exercised as well as whether the purported newly discovered evidence is material.

*Richardson*, 2024 Va. Unpub. LEXIS at *3.

In addition, the Supreme Court held that this Court "did not err in allowing the Commonwealth to file a brief that contradicted its initial brief." *Id.* at *6. The Supreme Court noted that "writs of actual innocence are a form of legislative grace not found at common law" and that "writs of actual innocence are wholly a creature of statute in derogation of the common law." *Id.* at *4-*5. Recognizing that "actual innocence proceedings are, functionally, a form of legislatively authorized approbation and reprobation," the Supreme Court also concluded that "it would be inconsistent to hold that the approbate-reprobate doctrine applies to amended pleadings filed in response to an actual innocence petition." *Id.* at *6. The Supreme Court posited that if it "were to conclude that the approbate-reprobate doctrine applied to amended pleadings filed in a writ of actual innocence proceeding, it would preclude the Commonwealth from changing its position even if, after initially opposing the grant of a writ [of] actual innocence, it subsequently concluded that the petitioner was actually innocent." *Id.* The Supreme Court opined that in such a situation, "there can be little doubt that the Commonwealth would not only be permitted to change its position, it would be encouraged to do so." *Id.*

By order entered on February 27, 2024, this Court remanded "this matter to the Circuit Court of Sussex County for the purpose of taking testimony under oath and subject to both cross-examination and the Rules of Evidence." *Richardson*, 80 Va. App. at 360. This Court directed the circuit court to "certify findings of fact" on "questions related to eyewitness Shannequia Gay," on "questions related to the photographs and the identification of the perpetrator," and on "questions related to the 911 call." *Id.* at 360-64. In addition, this Court directed the circuit court to "provide such factual findings regarding the apparent sincerity, conscientiousness, intelligence, and demeanor of the witness that it finds relevant to

assessing the truthfulness of his or her testimony"—as well as "to determine whether, in the exercise of diligence, the testimony and evidence could have been discovered or obtained before the time the conviction became final in the Circuit Court." *Id.* at 365.

### E. The Evidentiary Hearing Before the Circuit Court

At the evidentiary hearing before the Circuit Court of Sussex County, the circuit court heard sworn testimony from several witnesses addressing the 35 questions posed in this Court's published order remanding this matter to the circuit court for an evidentiary hearing.

Shannequia Gay testified under oath at the 2024 evidentiary hearing that she now has no independent recollection of the events that occurred on April 25, 1998. She effectively answered, "I don't remember," to the following questions:

- Whether she "saw the perpetrator fleeing the area where Officer Al[le]n Gibson was shot on April 25, 1998?";

- Whether she "saw a man with dreads wearing a white T-shirt running away from the area where Officer Gibson was shot on April 25, 1998?";

- Whether she "identified any individuals as the perpetrator to the police?";

- Whether she "w[as] initially shown a single photograph by Detective Greg Russell on April 25, 1998?";

- Whether she "identified an individual in that photograph to the police as the perpetrator who killed Officer Gibson?";

- Whether she was "shown an array [of] photographs by Investigator Tommy J. Cheek on April 25, 1998?";

- Whether she "identified an individual from [the] photo array to the police who ran from the police as the perpetrator who killed Officer Gibson?"; and

- Whether she "identified the man with dreads wearing a white T-shirt to the police as the perpetrator when shown photographs by the police on April 25, 1998?"

In addition, when asked whether her signature was on the handwritten document that was purported to be her statement to the police on April 25, 1998, Shannequia Gay stated, "That's my name," but she did not

-18-

recognize her signature. She also recognized her mother's name, Sharon Gay Turner, on the document, but she likewise did not recognize her mother's signature. Shannequia Gay reiterated that she did not remember being shown a single photograph or any photo lineup by the police on April 25, 1998, and she also did not remember the names of police officers Greg Russell, Terry Stevens, or Tommy Cheek. She did, however, remember a police officer named Mo Williams, but she stated, "I don't remember talking to him in 1998, but I remember talking to him when I got a little older." Finally, when asked whether she had ever seen Richardson before, Gay stated, "I haven't seen him. Mr. Richardson, look at me. I think I would remember if I saw you or not. I haven't seen him."

J. David Chappell, the former Commonwealth's Attorney of Sussex County who prosecuted Richardson's case, testified under oath at the 2024 evidentiary hearing that he had an "open file policy" with Richardson's defense counsel, David E. Boone, which he stated meant that "[t]he defense is entitled to everything I have"—including all documents from "the collective Commonwealth, not only my office, but my law enforcement partners." Noting that it has been 24 years since he had last seen the case file for Richardson's case, Chappell explained:

> I don't remember at this point any specific thing that was in my file at this juncture. I do remember a lot of discovery, including a conference right across the hall here where we went over the file completely.
>
> And so, my belief is everything that I had was part of it. If it hadn't gotten there before, it was part of that meeting. But, I just don't have every piece of paper that we went through. I just don't.

He then clarified, "But everything that was in that file was gone over, if not before, in that discovery conference. And I left that conference believing that we were completely on the same on defense and the Commonwealth." When asked if there were any documents that had been withheld from Richardson's case file, Chappell replied, "No, sir. Open file was an open file to me."

Chappell maintained that he has "no independent recollection of" Shannequia Gay, a photo lineup, or a 911 call. When asked about Shannequia Gay's involvement in this case, Chappell acknowledged that he has since been "provided information on the statement" that she purportedly made, and he noted, "Obviously,

-19-

I subpoenaed her." He testified, however, that his "only independent recollection" concerned "simply doing research on tender years towards the end of the case" in 1999 for "a younger person, potentially a younger witness." He explained, "I don't recall talking to her, and I'll just say any witness at this point. I cannot remember a specific witness interview in the course of at [*sic*] this juncture." In addition, when asked about Leonard Newby's role as a potential suspect in this case, Chappell stated, "I remember the name Leonard Newby just in general being in Sussex in law enforcement, but I don't have any specific recollection of his name as it involves this particular case. I do—I did know the name." He explained, however, that he had "no recollection of anybody else" being identified as a suspect in this case other than Richardson and Claiborne. Chappell reiterated that all information known to the Office of the Commonwealth's Attorney of Sussex County for Richardson's case would have been offered to Richardson's defense counsel as part of his open file policy.

David E. Boone, Richardson's original defense counsel, testified under oath at the 2024 evidentiary hearing pursuant to Richardson's waiver of his attorney-client privilege.[11] Boone testified that as a criminal

---

[11] Rule 3A:12(a)(4) provides:

> No subpoena or subpoena duces tecum may be issued in any criminal case or proceeding, including any proceeding before any grand jury, which is (i) directed to a member of the bar of this Commonwealth or any other jurisdiction, and (ii) compels production or testimony concerning any present or former client of the member of the bar, unless the subpoena request has been approved in all specifics, in advance, by a judge of the circuit court wherein the subpoena is requested after reasonable notice to the attorney who is the subject of the proposed subpoena. The proceedings for approval may be conducted in camera, in the judge's discretion, and the judge may seal such proceedings. Such subpoena request must be made by the attorney for the Commonwealth for the jurisdiction involved, either on motion of the attorney for the Commonwealth or upon request to the attorney for the Commonwealth by the foreman of any grand jury. An accused may also initiate such a subpoena request.

In order for David E. Boone and J. David Chappell to testify at the evidentiary hearing, Richardson initiated subpoena requests through the circuit court for those attorneys. At a motions hearing held prior to the evidentiary hearing, the circuit court ruled, "The Court is going to grant the motions requested by Mr. Richardson for the subpoena of witnesses," including for Boone and Chappell. We note that this Court has requested and received the entirety of the evidentiary record from the circuit court, including, but not

-20-

defense attorney, he tried "30 something capital cases" before representing Richardson in his case. He stated that he employed a private investigator named Jack Davis to assist him in his cases—with it being Davis's "responsibility to prepare the cases" and Boone's "responsibility to try the cases." Boone noted that Davis, who died "about five years ago," was "a retired Special Agent with the FBI." Boone described Davis as "ruthless" about investigating and preparing these cases and as someone who "was very good at what he did." Boone also noted that he and Davis "formed a team" with Claiborne's defense counsel, Michael Morchower, and with Morchower's private investigator, Joe Higgins, who "was a retired detective from the Richmond Bureau of Police."

Boone recalled that Shannequia Gay "had been developed as a potential witness," but he did not have a "specific recollection of the source of the information."[12] He then recounted:

> I can remember that it was a little girl I think that lived in the apartments that backed up to the wooded area that were shot. I recall that the little girl was with her cousin. I guess maybe another child, bikes were involved, I remember that. I remember she witnessed visual men either going into the woods or leaving the woods, and she heard what sounded like a gunshot. I remember that.

Noting that he "wanted to know what identification that child could make," Boone recalled that he "instructed Jack [Davis] to talk to the parents in interviewing the child." He explained that it was his policy that "because the witness was a juvenile he [Davis] had to get the permission of the guardian or parent of the child to interview the child." Boone went on to recount:

> I instructed Jack Davis to interview all potential witnesses. I instructed Jack to go talk to the police department and talk to the police officers. I instructed him

---

limited to, all witness subpoenas issued by Richardson between March 25, 2024, and May 22, 2024—as well as the circuit court's orders from the motions hearings, such as the May 16, 2024 motions order (from the May 6, 2024 motions hearing) granting Richardson "leave to issue witness subpoenas" for Boone and Chappell. Thus, the complete record from the circuit court related to the 2024 evidentiary hearing is now before this Court. Code § 19.2-327.13.

[12] On cross-examination, Boone agreed with counsel for the Commonwealth that he "knew who Shannequia Gay was in 1999," that he "knew she was a little girl who was supposed to have seen something about this case," and that he even "told Mr. Richardson about Shannequia Gay at some point." However, on redirect examination, he stated that he "wasn't aware" that Shannequia Gay purportedly identified a man in a white T-shirt with dreads in his hair.

to talk to David Chappell. I instructed him to talk to neighbors of witnesses. I instructed him to go to social, you know, Facebook and things of that sort, trying to discover what witnesses might or might not have to say. So, that's basically what I did. My job was a trial lawyer, and Jack was the investigator, as was Joe Higgins. Don't forget that Joe Higgins was trying to interview this girl as well.

According to Boone, "at that time, we were not allowed to depose witnesses in a criminal case," so "[i]f a witness didn't want to talk to us, we couldn't force a witness to talk to us."

When asked whether a handwritten document purporting to be Shannequia Gay's statement to the police was in former Commonwealth's Attorney J. David Chappell's open file, Boone replied, "If it was, I never saw it." In addition, when asked whether he had ever been presented with a photo array or photo lineup while trying this case, Boone stated, "No." Likewise, when asked whether he was provided a 911 call recording or a call summary in 1998, Boone replied, "Not to my knowledge." Boone contested Chappell's use of the term "open file," but he emphasized that Chappell "was very forthcoming with discovery." Boone noted that he and Chappell "had regular meetings where we would discuss the case. He would provide me with what I thought was everything he had, but I never once got to actually review his file, but discovery was very open. I won't say it was an open file, but it was an open discovery." Boone clarified that he had no reason to believe that Chappell had withheld any documents from him in Richardson's case.

Boone then testified that he had advised Richardson not to pursue a conditional guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), because he believed that the circuit court judge "would have refused to accept it." He recalled that Richardson had indicated to him before sentencing that he wanted to withdraw his guilty plea. Boone stated, however, that he had advised Richardson not to withdraw his guilty plea for "a lot of reasons." He noted that "the main reason was we were without a defense." Boone explained that "we did not have an alibi" because "our alibi witness, Shawn Wooden, would make a statement and testify at a preliminary hearing that Mr. Richardson was in fact with Wooden, but it was at a crime scene. And furthermore, Mr. Wooden testified that Mr. Richardson, in essence, confessed to him shortly after the shooting." Boone went on to explain, "I didn't have the ability to put Mr. Richardson on the

-22-

stand because he would be asked, where were you at the time of the offense. And he would have to testify that he was with S[haw]n Wooden," who "agreed that he was with him when he was at the crime scene." In addition, Boone pointed out that there was "no third-party suspect" as "[t]his case started out as a who done it and quickly morphed into a what did he [Richardson] do." Boone opined, "The best we could do with this hand of cards was involuntary manslaughter, which I envisioned at the time as considering everything going on a good result."

Shawn Wooden testified under oath at the 2024 evidentiary hearing that in April 1998, he was residing in Waverly, Virginia, with his son's mother, Javona Jones. When asked about his involvement in the investigation into the shooting of Officer Gibson, Wooden stated, "I don't remember everything back then. That was so long ago that a lot of stuff happened since then. I don't remember about the incident. I put it behind me and moved [o]n." Wooden acknowledged that he was present nearby when Officer Gibson was shot, and he stated, "At that time, I was testing crack cocaine." He also stated that Officer Gibson "said halt when he walked up, when he came up." In addition, Wooden stated that "Terrence" was with him at that time and that "[i]t was three of us. Yeah, it was three of us. It was another guy with us I think. I believe somebody else bought the cocaine there."[13] When asked if Richardson had dreadlocks in April 1998, Wooden replied, "I believe he had dreadlocks, yes."[14]

Wooden was then asked to describe what had occurred during the April 1998 shooting of Officer Gibson, to which he replied, "I don't know nothing about what happen when he got shot. You're asking me stuff to remember way back then. Way back then you're asking me to remember stuff that I can't remember what happened right back then at this present time." He recalled, however, that "at some time, I went back to

---

[13] On cross-examination, Wooden clarified that when testifying on direct examination, he had been relaying information from "a document that I had just in front of me," but he was not actually testifying then from his own personal knowledge as to that information because "I can't remember in exact."

[14] Anthony Jones testified under oath at the 2024 evidentiary hearing that he was Shawn Wooden's neighbor in 1998, that he saw Richardson on the morning of April 25, 1998, and that Richardson's hairstyle was in "braids" and "plats" at that time.

my house," but he did not "recall exactly what time of day it was." When asked whether Richardson returned to Wooden's home after Officer Gibson had been shot, Wooden stated, "I don't know if he met me back there when he was shot or when he came back, what time when he came back there, or exactly when he met me back there." Wooden believed that Javona Jones, his girlfriend at that time, had been at their home before he and Richardson had left, but he could not "remember if she was awake or not."

Wooden was also asked, "[D]id Mr. Richardson admit to you that he shot the new cop at your trailer?" Wooden responded, "I don't recall. I don't recall where he was at. If he told me at the trailer or not, I am not sure." He went on to state, "I am not sure where it was at when he told me." Wooden was then asked, "[D]id Mr. Richardson ever tell you he shot the new cop?" Wooden replied, "I don't think so." On cross-examination, however, Wooden clarified that Richardson may have told him that Richardson had shot "the new cop," "but I don't know when or where or what." Wooden explained, "I'm not sure whether it was said or not. I can't—I can't be sure, so I don't know or not." Wooden agreed with counsel for the Commonwealth that his memory was fresher when he testified under oath at the preliminary hearing on October 15, 1998, and Wooden confirmed that his testimony at that preliminary hearing was accurate.

Javona Jones testified under oath at the 2024 evidentiary hearing that on Friday, April 24, 1998, she went to sleep in her bed with Shawn Wooden, her boyfriend at that time. She recalled that Wooden was in bed with her when she awoke the next day, and she stated that she got out of bed at "11:00 or 12:00, I never stay in bed past 1:00." She recounted that the first time she awoke that morning was "[e]arly, I think I woke up about 8:00" because "[m]y kids were up and just rowdy, rowdy for some reason that morning." When asked if anything else had awakened her that morning, Javona Jones stated, "I think Terrence Richardson down the hall" "[a]round 9:00, 10:00, 9:00." She further recounted that "between about 12:00 or eleven o'clock," Wooden and Richardson left the home "[t]o go be nosy to my knowledge." She did not remember how Richardson had his hair in April 1998. She acknowledged that she now does not like Wooden, but she maintained that those feelings did not affect her current testimony.

-24-

Terry Ann Stevens, who had been a special agent accountant with the Virginia State Police, testified under oath at the 2024 evidentiary hearing that she only has "flashes of memory" about her involvement with the homicide investigation into the shooting of Officer Gibson on April 25, 1998. She stated, "I recall it being dark. I recall being in the parking lot outside of—in the parking lot of the crime scene area. I recall being called over to witness a signature on a document." However, she noted, "I don't recall who called me over. I just remember being told to go over, and I remember someone calling me, had to hold a flashlight for me to sign the document." When shown a document purporting to be "a statement of Shannequia Gay given on 4-25-98 at 9:46 p.m.," Stevens acknowledged that her signature was on that "handwritten document." When asked why she had signed that document, Stevens explained that because "there were multiple agencies who had responded to this crime scene" and because "they had not determined which agency was going to be working this investigation," "they wanted multiple police officers from different agencies to sign in case it was going to be the Sheriff or State Police that was working the case."

Furthermore, when shown a purported "photo lineup" that "says SG and Shannequia Gay on the document," Stevens testified that she initialed that document on "4-25-98 at 11:59 PM." However, she clarified, "I don't recall showing the photo lineup. My signature would be there if somebody identified something in the lineup." She noted that she interviewed Shannequia Gay "a few weeks after the crime." When asked on cross-examination whether she has "any independent recollection of any interaction that you had with that particular lineup," Stevens stated, "I don't recall." In addition, when asked about a subpoena served on Shannequia Gay, Stevens stated, "I don't recall any subpoenas." She also did not recall interviewing or investigating Leonard Newby in connection with the shooting of Officer Gibson.

Tommy Cheek, who had been an investigator with the Sussex County Sheriff's Office, testified under oath at the 2024 evidentiary hearing that he was the lead investigator in the case involving the shooting of Officer Gibson in April 1998. Cheek recalled, "There was a young girl that was interviewed, but not by myself. Deputy Russell and one of [*sic*] Valerie Ricks interviewed her. I did not." He did not remember the name of the "young girl," nor did he remember showing any photo lineup to the "young girl," noting that "she

-25-

may well have been shown one but not by me." Cheek testified that the large case file, which had been sent to the Commonwealth's Attorney of Sussex County and to federal law enforcement authorities, included "[e]verything that I did as an investigator" in this case.[15] He explained that "we didn't withhold anything on my part. They got all of the supplemental reports, and all of the witness statements, all of the polygrams [*sic*] resources. They got everything I got."

When asked about a man named Leonard Newby, Cheek replied, "I remember the name. We've had dealings with him." When asked specifically whether Newby was a suspect in the 1998 shooting of Officer Gibson, Cheek stated, "I just recall that there was a lot of people that we were looking at and he was one of them." Cheek explained that he later determined that Leonard Newby "didn't appear to be involved at all" in the shooting of Officer Gibson, and he confirmed that Newby "was eliminated during my investigation. And rather than spend a lot of time on somebody that we eliminated, I concentrated on the person who was the suspect, the people that were suspects." When asked how he ruled out Leonard Newby as a suspect, Cheek explained, "Through interviews and placing him at another place at that time, different investigations." Cheek did not recall who had provided him with that information, but he did recall that when "Newby said he was somewhere else," Cheek personally "went and talked to whoever and verified that he [Newby] was, in fact, was there."

Greg Russell, who had been a detective with the Sussex County Sheriff's Office, testified under oath at the 2024 evidentiary hearing that he assisted with the investigation into the shooting of Officer Gibson on April 25, 1998. Russell recalled interviewing Shannequia Gay on the night of the shooting, and he noted that he wrote down her statement about what she saw at the crime scene—which he later shared with the other investigators and "put it in my case file." He clarified, however, that he did not have any personal knowledge about what Shannequia Gay recounted to him in her statement—only that the statement reflected "what she

_____

[15] Ernest L. Giles, Sr., the current Sheriff of Sussex County, testified under oath at the 2024 evidentiary hearing that he was "a correctional deputy" in 1998 and that at that time, "[t]o my knowledge each deputy was responsible to hold their file, turn it over to the Commonwealth's Attorney office upon arrest or any type of investigation."

spoke to me." Furthermore, Russell recalled showing Shannequia Gay a photograph of a single individual for the purpose of "[i]nitially, trying to determine hairstyle of what she described in a statement." When asked about the hairstyle of the individual in the single photograph, Russell stated, "I can't describe the hairstyle. They had hair, but I cannot define the hairstyle." When asked to recall the identity of the individual in the single photograph, Russell testified, "Terrence Richardson." He noted that the single photograph of Terence Richardson also "became part of my case file." In addition, when asked about a photo lineup, Russell acknowledged that a photo lineup had been created, but he did not know by whom or for what purpose. When asked to identify the purported photo lineup, Russell stated, "Sir, I don't know. I didn't make it." He also stated that he did not see a photo lineup on the evening of April 25, 1998.

### F. The Circuit Court's Certified Findings of Fact

After observing all the witnesses testify under oath at the 2024 evidentiary hearing, the circuit court provided this Court with its certified Findings of Fact. The circuit court addressed each of the 35 questions posed by this Court in the published order remanding this matter for an evidentiary hearing.

#### 1. *Findings Related to Shannequia Gay*

First, the circuit court addressed each witness who testified under oath at the 2024 evidentiary hearing about Shannequia Gay.

At the outset, the circuit court recognized that "[t]he events happened on April 25, 1998, at which time Shannequia Gay was nine years old" and that Shannequia Gay was now "[a]ppearing twenty-six years later to testify at this evidentiary hearing." Finding that "Ms. Gay was sincere, conscientious, intelligent, and her demeanor was indicative of truthfulness," the circuit court noted that "Ms. Gay was unable to recall anything from the day of the event, even after attempts to refresh her recollection," and that she "had no independent recollection of anything that occurred on April 25, 1998, including any interactions with police." In particular, the circuit court detailed that "Ms. Gay did not remember being shown a photograph" or "an array of photographs by police in 1998" and that she "could not answer whether she identified an individual" from "that photograph" or from "that photograph array to the police as the perpetrator who killed Officer Gibson."

-27-

She likewise "could not answer who she identified as the 'man with dreads' wearing a white t-shirt." Furthermore, "Ms. Gay was unable to identify the Petitioner as he sat in court" at the evidentiary hearing, and she "could not remember whether she could differentiate between cornrows and dreadlocks when she was nine years old."

The circuit court then noted that J. David Chappell, the former Commonwealth's Attorney of Sussex County, testified under oath that "he was unfamiliar with the names Shannequia Gay and her mother Sharon Gay Turner" and that he "did not remember taking any actions regarding Shannequia Gay in 1998." The circuit court recounted that Chappell "testified he had no specific recollection of anything in the file," but he "did state, under oath, that he provided everything he had or knew at the time to Mr. Boone," and he "further recalled a meeting with Mr. Boone where they went over the file 'completely.'" The circuit court found that "Mr. Chappell was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

The circuit court went on to note that Richardson's original defense counsel, David E. Boone—whom the circuit court described as an "experienced criminal defense counsel" with "prior involvement in at least thirty capital cases"—testified under oath that "he was aware of Shannequia Gay as a witness in the case." Boone also testified that he was aware that "a 'child' had made an identification in the case." Although Boone stated that "he never saw the '[Shannequia] Gay Statement'" and that he "did not remember it being in Mr. Chappell's file," the circuit court pointed out that "Mr. Boone availed himself of Mr. Chappell's open-file policy and met with Mr. Chappell on several occasions" to discuss this case. The circuit court also noted that Boone testified that "any actions taken to locate and speak with Shannequia Gay were undertaken, at his direction, by his private investigator Jack Davis"—a "former decorated FBI agent" who Boone said "was 'ruthless' and would get the answer 'one way or the other.'" The circuit court further noted that Boone had "instructed Mr. Davis to seek permission to interview the child from her parents," but that "Mr. Davis was never able to secure an interview." The circuit court found that "Mr. Boone was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

Furthermore, the circuit court described that former Virginia State Police Special Agent Terry Ann Stevens testified under oath that "she was working with the Virginia State Police as a special agent accountant on April 25, 1998"—and that "she was called to the scene of the crime and recalled signing a document in her official capacity as a Virginia State Police investigator." The circuit court noted that Stevens testified that "she did not serve a subpoena on Shannequia Gay," that "she did not recall any subpoenas being served on Ms. Gay," and that she "was unable to recall whether Shannequia Gay was subpoenaed to testify in Mr. Richardson's case." The circuit court found that "Ms. Stevens was sincere, conscientious, intelligent, and her demeanor was indicative of truthfulness."

The circuit court also described that former Sussex County Detective Greg Russell testified under oath that "he interviewed Shannequia Gay on what he believed was the night of April 25, 1998," and that "he believed Valerie Ricks and Terry Ann Stevens were also present for the interview." The circuit court noted that Russell testified that "Ms. Gay gave a statement describing what she said she saw," that he "handwrote her statement," and that he later "identified that statement, along with his signature, in open court." Furthermore, Russell "indicated he provided said statement to Detective Cheek and Sheriff [E.S.] Kitchen[, Jr.]." The circuit court found that Russell "was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

After recounting this extensive sworn testimony, the circuit court found that "Mr. Richardson is unable to establish whether he exercised reasonable diligence to discover or obtain the testimony and evidence" concerning Shannequia Gay. The circuit court also found that "because Mr. Boone had no personal knowledge of what Mr. Davis did regarding interviewing Ms. Gay, and because Mr. Davis is deceased, Mr. Richardson is unable to produce the evidence necessary for the Court to find that Mr. Richardson exercised reasonable diligence."

2. *Findings Related to the Photographs and the Purported Identification of the Perpetrator*

Next, the circuit court addressed each witness who testified under oath at the 2024 evidentiary hearing about the photographs purportedly shown to Shannequia Gay on April 25, 1998, as well as any potential identification of a perpetrator that Shannequia Gay may have made at that time.

Addressing the sworn testimony from law enforcement, the circuit court noted that Greg Russell "affirmatively stated, under oath, that he did show a single photograph of Terence Richardson to Shannequia Gay" and that "the photo was shown to her to determine hairstyle"—although Russell "could not describe/define the hairstyle of the person in the photograph." Russell also "stated the individual photograph became part of his case file, which was tendered to Detective Cheek." The circuit court then recounted that former Sussex County Investigator Tommy Cheek "affirmatively stated, under oath, that he did not show an array of photographs to Shannequia Gay on April 25, 1998," and that "a photo array may have been shown to Shannequia Gay, but 'not by [him].'" (Alteration in original). The circuit court found that although Cheek "appeared physically frail, specifically suffering from mobility issues," he "remained mentally aware" and "was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness." The circuit court also found that Terry Ann Stevens "did not recall the photo array but identified her signature on it in open court"—and that Stevens "did not confirm the identity of any person that Shannequia Gay may have identified in a photograph presented to her on April 25, 1998."

Turning to the actions of counsel, the circuit court recounted that J. David Chappell "stated that he, as Commonwealth's Attorney, had an open-file policy" in which "he shared the contents of his file with Petitioner through counsel David Boone." The circuit court noted that Chappell "further recalled a meeting with Mr. Boone where they went over the file 'completely'" and that he "did not recall anything being withheld from the open-file policy." In addition, the circuit court recognized that although Boone "stated that he had never seen or reviewed Mr. Chappell's actual file," Boone "clarified that Mr. Chappell had been forthcoming with discovery, regularly met with Mr. Boone, and Mr. Chappell provided 'everything he had.'"

The circuit court pointed out that Boone "further stated he had no reason to believe that Mr. Chappell had withheld any documents from him."

The circuit court then described Shawn Wooden's sworn testimony, finding that he "was sincere and appeared to be telling the truth based upon his limited memory"—particularly "when stating he had put these events behind him and did not want to be thinking of them anymore." The circuit court noted, "Despite being shown documents attempting to refresh his recollection, Mr. Wooden was unable to recall his testimony, but never denied having made testimony in subsequent proceedings," such as in federal court. The circuit court detailed that although Wooden "first testified that he did not recall whether Mr. Richardson made any comments or statements to Mr. Wooden once they got back to the trailer on April 25, 1998," Wooden later "affirmatively stated, under oath, that Mr. Richardson told him that Mr. Richardson had shot the new cop, but Mr. Wooden could not recall where or when Mr. Richardson made the statement." In addition, the circuit court recounted:

> Shawn Wooden was unable to affirmatively state, under oath, that he told the police that Mr. Richardson shot Officer Gibson; that he identified any other individuals besides Mr. Richardson to the police as having shot Officer Gibson; or if he told the police that Mr. Richardson had dreads. Mr. Wooden was unable to remember his hairstyle or Mr. Richardson's hairstyle at the time of the event.

The circuit court determined, "From the evidence presented, this Court cannot find that Mr. Wooden ever changed his story concerning this information."[16]

After hearing this extensive sworn testimony at the 2024 evidentiary hearing, the circuit court found, "Mr. Richardson is unable to establish whether he exercised reasonable diligence to discover or obtain the testimony and evidence" related to any photographs or any purported identification of the perpetrator. In making that finding, the circuit court explained:

> Mr. Richardson, through Mr. Boone, exercised some diligence in that he availed himself of Mr. Chappell's open-file policy and met with Mr. Chappell

---

[16] In addition, the circuit court found that Javona Jones "appeared sincere, but her precise memory of events was questionable." The circuit court also found that Anthony Jones "was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

-31-

on several occasions. However, Mr. Boone testified he had never seen any photo or photo array/lineup regarding this case. Mr. Boone further testified he had no reason to believe Mr. Chappell was withholding documents from him. The Court received no evidence about what investigator Jack Davis did on Mr. Richardson's behalf.

The circuit court ultimately found, "Mr. Richardson has failed to meet his burden of showing his 'devoted and painstaking application' to obtain this evidence."

### 3. *Findings Related to the Purported 911 Call*

Finally, the circuit court addressed the lack of testimony and the lack of evidence related to the purported 911 call. The circuit court noted, "No testimony was elicited from Terry Ann Stevens, or any other representative of the Virginia State Police, regarding whether the Virginia State Police have a recording of the 911 call from April 30, 1998"; whether "the Virginia State Police have information concerning the origin of the 911 call"; whether "the Virginia State Police have information concerning the identity of the caller from the 911 call"; whether "the Virginia State Police have information concerning the foundation of the caller's knowledge from the 911 call"; or even whether "the Virginia State Police have information concerning the identity of the individual who received and transcribed the 911 call." The circuit court pointed out that "David E. Boone testified that he had no knowledge related to a 911 call from April 30, 1998, and, therefore, never directed his investigator, Jack Davis, to request information from the police." Likewise, "J. David Chappell testified that he did not recall the 911 call from April 30, 1998," and that "he did not recall making any request for information from the police concerning the 911 call." The circuit court found, "Because Mr. Richardson presented little to no testimony or evidence relating to" the purported 911 call, "Mr. Richardson has failed to meet his burden of showing his 'devoted and painstaking application'" to obtain this evidence.

### G. The Parties' Supplemental Briefing and Motions

Following the evidentiary hearing before the circuit court, the parties filed their respective supplemental briefs with this Court in accordance with this Court's order directing the parties to address the

circuit court's findings from the evidentiary hearing. *Richardson v. Commonwealth*, No. 0361-21-2 (Va. Ct. App. June 27, 2024) (order).

In his supplemental brief, Richardson contends that the statement from Shannequia Gay—which he describes as "a credible identification of 'man with dreads' as Officer Gibson's shooter"—is "material" within the meaning of Code § 19.2-327.11(A)(vii) of the actual innocence statute. He also contends that the photograph array—which he describes as "a credible identification of a 'man with dreads' as Officer Gibson's shooter"—is likewise "material" within the meaning of Code § 19.2-327.11(A)(vii) of the actual innocence statute. Richardson, however, concedes:

> The third piece of evidence, the "911 Tip," . . . corroborates Ms. Gay's statement and photo identification. However, its veracity could not be substantiated. Undersigned counsel exhausted all avenues of investigation to determine the identity of the caller and truth of this tip. The Sussex County Sheriff's Office case file contained the original 911 Tip; no other file produced in response to Virginia Freedom of Information Act (VFOIA) requests did. To the best of our current knowledge, no law enforcement agency has a record of the caller's identity, nor record of any follow up investigation conducted in response to this call. Accordingly, Mr. Richardson withdraws Exhibit I, the 911 Tip, from this Court's consideration, because it does not meet all the criteria set forth in Virginia Code section 19.2-327.13.

Richardson argues that this allegedly new evidence (i.e., Shannequia Gay's statement and the photographs) is not "merely cumulative, corroborative or collateral" within the meaning of Code § 19.2-327.11(A)(viii) because both pieces of evidence "identify another suspect" other than Richardson "as the man who shot Officer Gibson." He also argues that "[n]o rational trier of fact would convict" him and that his "guilty plea should be afforded little weight."

In addition to his supplemental brief, Richardson moved this Court to expand the record "to include new, relevant evidence that he discovered while preparing for his evidentiary hearing and in the weeks following the hearing." Among the exhibits attached to his motion to expand the record is a "February 20, 2001, letter from then-[Assistant] United States Attorney David Novak," in which Richardson states that "[t]hen-[Assistant] United States Attorney David Novak twice informed federal trial counsel that Ms. Gay

-33-

identified Leonard Newby in a single photo and in a photo array on April 25, 1998." In that February 2001

letter, then-Assistant U.S. Attorney Novak wrote, in relevant part:

> I write to provide you additional information regarding the identification procedures involving Shannequia Gay and to clarify the factual background for the identification procedures.
>
> As set forth in the Notice Regarding Shannequia Gay provided in the discovery, Shannequia Gay was riding her bicycle in the Waverly Village Apartments at the time of the murder and, after hearing the gunshot, went to her aunt's apartment and then to the back of the apartments where she saw a black male (who the Government alleges was Terence Richardson) with something in his hands standing near where Officer Gibson was laying. She gave the following description of the black male: tall, skinny, dark skin, corn rows haircut, light beard, wearing a white t-shirt and long dark shorts. She was involved in two photographic identification procedures. At approximately 9:30 p.m. on April 25, 1998, Sussex County Deputy Sheriff Greg Russell showed her a single photograph of Leonard Newby, an early suspect in the case who is a black male and has dread locks. No identification was made but she got afraid when shown the picture. Obviously, Deputy Russell erred when he showed this single photograph to Ms. Gay.
>
> At approximately 11:15 p.m. that same evening, Sussex County Deputy Tommy Cheeks compounded this error when he (along with VSP Special Agent Terry Stevens and Sussex County Deputy Valerie Patterson-Ricks) showed a photo spread to Ms. Gay that contained Leonard Newby's photograph in position 2. At that time, Ms. Gay stated that the man that she saw near the fallen officer was not in the photo spread. As she was being driven home by Sussex County Deputy Valerie Patterson-Ricks, Ms. Gay stated that she saw someone with "dreds" in the photo spread. Unsure if this referred to an identification, Deputy Patterson-Ricks took Ms. Gay to be interviewed by VSP Special Agent Terry Stevens, who then interviewed Ms. Gay alone. VSP Special Agent Stevens then showed Ms. Gay the same photo spread as Deputy Cheeks. Ms. Gay signed her name under the photo in position 2. The officers are unclear whether this indicated any identification or whether it indicated that she recognized the photo from the earlier single photo identification process. Indeed, there is no report regarding this process because VSP Special Agent Stevens discarded any value to this identification process since it had been clearly tainted by the earlier individual photograph shown by Deputy Russell.

Furthermore, in what he calls the "[c]omplete Sussex County Commonwealth's Attorney's Office file

for this case," Richardson provides a copy of the subpoena dated November 5, 1999, for "SHANNEQUIA

GAY, Waverly Village Apts., Waverly, VA," for her to testify before the Circuit Court of Sussex County at

Richardson's original scheduled trial on December 8, 1999. He also provides a copy of the proof of service

dated November 12, 1999, which states, "Shannequia Gay is a juvenile served on father[.]" That same document indicates that the proof of service was returned to the Clerk's Office of the Circuit Court of Sussex County on November 19, 1999.

The expanded record also includes an affidavit dated June 26, 2024, from Terry Ann Stevens, in which she states, "Having viewed Mr. Richardson at the evidentiary hearing, I am confident that the little girl (Shannequia Gay) did not identify him in the April 25, 1998, Photo Identification Lineup." She avers, "The man that Ms. Gay identified was larger and had a hairstyle different from Mr. Richardson." She goes on to state, "I know that I would not have signed my name to the April 25, 1998, Photo Identification Lineup shown to me at the evidentiary hearing unless a positive identification was made." In addition, Stevens claims, "I am pretty certain I wrote a report about the April 25, 1998, photo identification after it happened, as that would have been standard practice," but her "report about the April 25, 1998, Photo Identification Lineup was not in the case file." She maintains that she "was provided with a copy of the case file" but that "the Photo Identification Lineup from April 25, 1998, was not in the case file." She also states, "On May 13, 1998, supervision sent me to interview the little girl who I now remember to be Shannequia Gay," but she now claims that her "field notes from the May 13, 1998, interview was [*sic*] not in the case file."

In its supplemental brief, the Commonwealth asks this Court to dismiss Richardson's petition for a writ of actual innocence, arguing that "Richardson has failed to prove that any evidence regarding Ms. Gay was 'previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction . . . became final in the circuit court'"—as required by Code § 19.2-327.11(A)(iv)(a) for a writ of actual innocence. The Commonwealth argues that Richardson has also "failed to prove that he could not have discovered his proffered documents through the exercise of diligence before his conviction became final." Furthermore, the Commonwealth contends that Richardson's "proffered documents are immaterial, and a rational trier of fact would again convict him." In addition, the Commonwealth opposes Richardson's motion to expand the record.

## II.  ANALYSIS

"Code §§ 19.2-327.10 and -327.11(A) confer upon this Court jurisdiction over petitions for actual innocence based on non-biological evidence." *Brewer v. Commonwealth*, 82 Va. App. 681, 687 (2024) (quoting *Grimm v. Commonwealth*, 81 Va. App. 74, 94 (2024)).  Indeed, the judicial power to grant writs of actual innocence "can only be exercised 'in *such cases* and in *such manner* as may be provided by the General Assembly.'"  *In re Brown*, 295 Va. 202, 209 (2018) (emphases in original) (quoting Va. Const. art. VI, § 1).  As the Supreme Court of Virginia has stated, such petitions present "one of the rare situations in which the General Assembly has charged an appellate court with engaging in factual evaluation." *Dennis v. Commonwealth*, 297 Va. 104, 127 (2019).  Thus, "[i]n proceedings under the statutes governing petitions for writs of actual innocence based on nonbiological evidence," an appellate court "has the same authority to weigh and evaluate documentary and physical evidence as a trial court would have." [17]  *Id.* (quoting *Haas v. Commonwealth*, 283 Va. 284, 291 (2012)).

A person seeking a writ of actual innocence must produce "sufficient new evidence to establish the statutory requirements to the requisite level of proof to warrant overturning a presumptively valid conviction." *Grimm*, 81 Va. App. at 92-93 (quoting *Tyler v. Commonwealth*, 73 Va. App. 445, 459 (2021)).  In exercising our jurisdiction over petitions for writs of actual innocence, we must consider "the record of any trial or appellate court action," Code § 19.2-327.11(D), as well as "the petition, the response by the Commonwealth, previous records of the case, the record of any hearing held under" the actual innocence statutes, "and, if applicable, any findings certified from the circuit court pursuant to an order issued under" the actual innocence statutes, Code § 19.2-327.13.

---

[17] As noted *supra*, this Court and the Supreme Court have both recognized that the approbate-reprobate doctrine does not apply to amended pleadings filed in response to an actual innocence petition. *Richardson*, 75 Va. App. at 132 n.5, *aff'd in part and rev'd on other grounds*, *Richardson*, 2024 Va. Unpub. LEXIS at \*3.  Thus, the Commonwealth is not precluded from changing its position in an actual innocence case and, as is the case here, the Commonwealth may file a brief that contradicts its initial brief. *Id.*

It is well-established that in order to be entitled to a writ of actual innocence, "'the petitioner must present "new" evidence' of his innocence."[18]  *Grimm*, 81 Va. App. at 93 (quoting *Parson v. Commonwealth*, 74 Va. App. 428, 440 (2022) (quoting *Tyler*, 73 Va. App. at 463)).  As this Court has explained:

> To meet this requirement, the petitioner must show *both* that the evidence "was previously unknown or unavailable to him or his trial attorney of record at the time the conviction . . . became final in the circuit court" *and* "that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before" his conviction became final in the circuit court.

*Brewer*, 82 Va. App. at 688 (alteration and emphases in original) (quoting Code § 19.2-327.11(A)(iv)(a), (vi)(a)).  "In the context of the actual innocence statutes, we have defined diligence as a 'devoted and painstaking application to accomplish an undertaking.'"  *Tyler*, 73 Va. App. at 464 (quoting *Madison v. Commonwealth*, 71 Va. App. 678, 702 n.14 (2020)).  For example, in *Tyler*, this Court found that the petitioner failed to satisfy the diligence requirement under Code § 19.2-327.11(A)(vi)(a) because the petitioner had failed to subpoena a known witness—thus amounting to "far less than a 'devoted and painstaking application to' have his version of events heard at trial."  *Id.* at 465.  Likewise, in *Madison*, this Court found that the petitioner failed to prove that he exercised the diligence required by Code § 19.2-327.11(A)(vi)(a) because the petitioner failed to demonstrate that he "exercised any diligence in trying to locate and speak to [a witness] at any time prior to trial" or even within "21 days following the entry of the final conviction order."  71 Va. App. at 702 n.14.

In addition, the petitioner must prove "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that *no*

---

[18] "Evidence is something (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact."  *Brewer*, 82 Va. App. at 688 n.4 (quoting *Knight v. Commonwealth*, 71 Va. App. 492, 518 (2020)).  A fact is "[a]n actual or alleged event or circumstance, as distinguished from its legal effect, consequence, or interpretation."  *Black's Law Dictionary* 732 (12th ed. 2024).  "In contrast, 'legal arguments,' including those 'capable of being raised on direct appeal,' are 'not "evidence."'"  *Brewer*, 82 Va. App. at 688 n.4 (quoting *In re Neal*, 44 Va. App. 89, 90 (2004)).

rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt."[19] *Tyler*, 73 Va. App. at 462 (quoting Code § 19.2-327.11(A)(vii)) (emphasis added). Indeed, "it is not enough for [the petitioner] to convince us that some, many, or even most rational factfinders would have acquitted him." *Id.* at 469. Rather, the petitioner "must prove that *every* rational factfinder would have done so." *Id.* (emphasis in original). Furthermore, the petitioner must establish "that the previously unknown, unavailable, or untested evidence is not merely cumulative, corroborative, or collateral." Code § 19.2-327.11(A)(viii).

It is well-settled that "[t]he petitioner must prove *all* these elements by a preponderance of the evidence," *Grimm*, 81 Va. App. at 93 (quoting *Parson*, 74 Va. App. at 441) (emphasis added), and "the preponderance standard is satisfied when the evidence convinces a factfinder that a particular fact in dispute was 'more probable than not,'" *Tyler*, 73 Va. App. at 461 (quoting *Lysable Transp., Inc. v. Patton*, 57 Va. App. 408, 419 (2010)). However, it is equally well-settled that the petitioner's failure to establish *any one* of the necessary elements "requires us to dismiss his petition." *Id.* at 463.

### A. Shannequia Gay

In his petition, Richardson bases his claim of innocence, in part, on a "handwritten statement of an eyewitness, Miss Shannequia Gay," in which she "identified the perpetrator as man with dreads wearing a white t-shirt." Richardson maintains, "I wore my hair in cornrows at the time." He goes on to state in his petition, "In November 2007, I became aware of the existence of the handwritten statement of Miss Shannequia Gay." However, he later states in his petition:

> I became aware of the existence of the [Shannequia] Gay Statement in 2018 when my current counsel, Jarrett Adams, Esq. ("Mr. Adams"), conducted an investigation and discovered the document in five boxes of federal discovery that was sent to me and was kept in inmate storage. This file had been sent to

---

[19] Prior to July 1, 2020, the fact that Richardson pleaded guilty to the felony offense of involuntary manslaughter would have prevented this Court from exercising jurisdiction to review his petition for a writ of actual innocence. In 2020, however, the General Assembly amended Code § 19.2-327.10 to remove the guilty plea limitation. *See* 2020 Va. Acts chs. 993, 994. Although Richardson's guilty plea does not bar our review of his petition for a writ of actual innocence, his "sworn admission of guilt remains 'one of many factors'" that we must consider in assessing Richardson's burden to prove that *no* rational factfinder would now find proof of guilt beyond a reasonable doubt. *Parson*, 74 Va. App. at 444 n.7 (citing *In re Watford*, 295 Va. 114, 126 (2018)); *see* Code §§ 19.2-327.11(A)(vii) and 19.2-327.13.

me by my federal trial counsel, Mr. John B. Boatright, III, before he passed away. I was not aware that the [Shannequia] Gay Statement was never turned over until 2020.

Richardson contends, "The evidence could not have been discovered or obtained by the exercise of diligence before the expiration of 21 days following entry of the final order of conviction." He further contends:

The evidence upon which I based my claim is material and, when considered with all of the other evidence in the record, will prove that no rational trier of fact would have found me guilty or delinquent beyond a reasonable doubt of the charge(s) described above because had the evidence been available, my counsel would have never advised me to take a guilty plea.

In this case, Richardson has failed to demonstrate a "devoted and painstaking application" to obtain the evidence from Shannequia Gay that he relies upon in his petition. *Tyler*, 73 Va. App. at 465; *Madison*, 71 Va. App. at 702 n.14. The record shows that Shannequia Gay had been subpoenaed by the prosecution to testify at Richardson's scheduled trial *before* Richardson entered his guilty plea to involuntary manslaughter and *well before* his conviction became final in the circuit court. Indeed, J. David Chappell, the former Commonwealth's Attorney of Sussex County who prosecuted Richardson's case, testified under oath at the 2024 evidentiary hearing before the circuit court that he "subpoenaed her" although he noted that he does not "recall talking to her." The subpoena dated November 5, 1999, directed "SHANNEQUIA GAY, Waverly Village Apts., Waverly, VA," to testify on December 8, 1999, at Richardson's scheduled trial in the Circuit Court of Sussex County. The proof of service provides that the subpoena was executed on November 12, 1999, and the proof of service states, "Shannequia Gay is a juvenile served on father[.]" The proof of service was also signed, date-stamped, and filed in the Clerk's Office of the Circuit Court of Sussex County on November 19, 1999. Instead of going to trial, however, Richardson elected to plead guilty to involuntary manslaughter on December 8, 1999. The circuit court entered the sentencing order several months later on March 8, 2000, so Richardson's conviction did not actually become final until the expiration of 21 days after March 8, 2000 (i.e., on March 29, 2000).

The record also shows that Shannequia Gay was known to *both* the prosecution and the defense as a potential witness *before* Richardson's scheduled trial in 1999. David E. Boone, whom Richardson had

retained as his defense counsel, testified under oath at the 2024 evidentiary hearing that Shannequia Gay "had been developed as a potential witness" although he did not have a "specific recollection of the source of the information." Boone—an experienced criminal defense attorney who had tried "30 something capital cases" before representing Richardson in this case—even agreed with counsel for the Commonwealth on cross-examination that he "knew who Shannequia Gay was in 1999," that he "knew she was a little girl who was supposed to have seen something about this case," and that he actually "told Mr. Richardson about Shannequia Gay at some point." Boone also recalled instructing his investigator, Jack Davis, "to talk to the parents in interviewing the child" because Boone "wanted to know what identification that child could make." Boone emphasized that Davis was "ruthless" as an investigator and that he was someone who "was very good at what he did." Boone could not opine, however, on what Davis actually "did or didn't do" with regard to interviewing Shannequia Gay or her parents, explaining, "I think I'm the wrong guy to be here for due diligence. It should be Jack Davis, really, but he's dead."

Although Boone stated at the 2024 evidentiary hearing that he "never saw" a statement from Shannequia Gay in the case file, he specifically recounted certain details that match the contents of that statement:

> I can remember that it was a little girl I think that lived in the apartments that backed up to the wooded area that were shot. I recall that the little girl was with her cousin. I guess maybe another child, bikes were involved, I remember that. I remember she witnessed visual men either going into the woods or leaving the woods, and she heard what sounded like a gunshot. I remember that.

Boone went on to testify that Chappell "was very forthcoming with discovery," and he emphasized that he had no reason to believe that Chappell had withheld any documents from him in this case. Indeed, Boone recalled that he and Chappell "had regular meetings where we would discuss the case. He would provide me with what I thought was everything he had, but I never once got to actually review his file, but discovery was very open. I won't say it was an open file, but it was an open discovery." The circuit court found that "Mr. Boone was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness." The

-40-

circuit court also found that "Mr. Chappell was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

After observing this sworn testimony at the 2024 evidentiary hearing, the circuit court found that "Mr. Richardson is unable to establish whether he exercised reasonable diligence to discover or obtain the testimony and evidence" concerning Shannequia Gay. The circuit court also found that "because Mr. Boone had no personal knowledge of what Mr. Davis did regarding interviewing Ms. Gay, and because Mr. Davis is deceased, Mr. Richardson is unable to produce the evidence necessary for the Court to find that Mr. Richardson exercised reasonable diligence."

In short, the record before this Court clearly shows that Richardson and his defense counsel had ample time and opportunity to investigate the subpoena for Shannequia Gay, to talk to Shannequia Gay about what she may have witnessed at the crime scene, or to work with her parents to facilitate such a conversation—all *before* what would have been Richardson's December 8, 1999 trial and *well before* Richardson's conviction became final in the circuit court on March 29, 2000. The subpoena for Shannequia Gay and the proof of service on her were on file in the Clerk's Office of the Circuit Court of Sussex County. Thus, both the defense and the prosecution were aware of Shannequia Gay as a potential witness while this case was still pending in the circuit court. Under these circumstances, Richardson has simply not proven that Shannequia Gay's statement is such that it could not, by the exercise of diligence, have been discovered or obtained before the time that the conviction became final in the circuit court. Code § 19.2-327.11(A)(vi)(a).

In addition, Richardson has failed to establish that Shannequia Gay's statement is "material" within the meaning of Code § 19.2-327.11(A)(vii) because he did not prove that the statement is true. Shannequia Gay testified under oath at the 2024 evidentiary hearing before the circuit court—over 26 years after the killing of Officer Gibson on April 25, 1998—that she had no independent recollection herself of the events that occurred in 1998 when she was just nine years old. As noted *supra*, Shannequia Gay effectively answered, "I don't remember," when asked a number of questions at the 2024 evidentiary hearing, including (1) whether she "saw the perpetrator fleeing the area where Officer Al[le]n Gibson was shot on April 25,

-41-

1998"; (2) whether she "saw a man with dreads wearing a white T-shirt running away from the area where Officer Gibson was shot on April 25, 1998"; and (3) whether she "identified any individuals as the perpetrator to the police."

Furthermore, when shown a handwritten document purporting to be the statement that she made to the police on April 25, 1998, she stated, "That's my name," but she did not recognize her signature on the document. She also observed her mother's name, Sharon Gay Turner, on the document, but she likewise did not recognize her mother's signature. After reviewing that document, Shannequia Gay was again asked whether she had "any independent recollection" of "the events of April 25, 1998," to which she replied, "No, ma'am." She was also asked, "Do you remember this document from April 25, 1998?" Shannequia Gay responded, "No, I do not." Shannequia Gay went on to testify that she did not remember speaking to any police officers on April 25, 1998, and she did not remember any police officers named Greg Russell or Terry Stevens (even though the record before us indicates that they both talked with her on the night of the day that Officer Gibson was killed). She also stated, "I haven't seen him," when looking at Terence Richardson at the 2024 evidentiary hearing. Ultimately, Shannequia Gay did not recall the statement presented by Richardson's counsel to the circuit court, she did not recall having ever made that statement, and she did not recall ever signing that statement.

After hearing Shannequia Gay's sworn testimony and observing her demeanor, the circuit court expressly found in its certified findings of fact that although "Ms. Gay was sincere, conscientious, intelligent, and her demeanor was indicative of truthfulness," she simply "was unable to recall anything from the day of the event, even after attempts to refresh her recollection." The circuit court noted that "Ms. Gay was unable to identify the Petitioner as he sat in court" at the evidentiary hearing—and that she "could not remember whether she could differentiate between cornrows and dreadlocks when she was nine years old." The circuit court then found that Shannequia Gay "had no independent recollection of anything that occurred on April 25, 1998, including any interactions with police."

Greg Russell, who had been a detective with the Sussex County Sheriff's Office, confirmed under oath at the 2024 evidentiary hearing that he had interviewed Shannequia Gay on the night of the shooting in 1998, that he had written down Shannequia Gay's statement in his handwriting about what she told him she had witnessed at the crime scene, and that he had later shared that handwritten document with the other investigators and had "put it in my case file." He made clear, however, that he has no personal knowledge about the contents of Shannequia Gay's statement—only that the document reflects "what she spoke to me" in 1998. Furthermore, Terry Ann Stevens, who had been a special agent with the Virginia State Police, confirmed under oath at the 2024 evidentiary hearing that her signature is on the "statement of Shannequia Gay given on 4-25-98 at 9:46 p.m.," but her only recollection of that statement was "being called over to witness a signature on a document." The circuit court found that Russell "was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness," and the circuit court also found that Stevens "was sincere, conscientious, intelligent, and her demeanor was indicative of truthfulness."

In short, given that no testimony was elicited at the 2024 evidentiary hearing concerning the actual *truth* of Shannequia Gay's purported statement to the police on April 25, 1998, we find that Richardson failed to meet his burden of establishing the materiality of that statement. Shannequia Gay's purported statement, which she cannot even remember making and which she did not vouch for in any way while testifying under oath at the 2024 evidentiary hearing, fails to satisfy the statutory requirements for the issuance of a writ of actual innocence, and we conclude, therefore, that Richardson has not satisfied his burden for the issuance of the writ under the actual innocence statute.

### B. The Photographs and the Purported Identification of the Perpetrator

In his petition, Richardson also bases his claim of innocence, in part, on a "photo array identification procedure conducted by state investigators with Miss Gay identifying a man named Leonard Newby as the 'man with dreads.'" The photo array provided to this Court with Richardson's petition and in the expanded record contains 12 photographs (in black and white) depicting the silhouette of a head and upper torso of a person in each photograph—although individual facial features and other identifying characteristics are

simply not visible in these photographs. Richardson states in his petition, "In May 2020, I became aware of the photo identification procedure where Miss Gay identified Leonard Newby as the 'man with dreads.'" However, he goes on to state in his petition, "As a result of an investigation of my counsel, Jarrett Adams, Esq. ('Mr. Adams'), I became aware of [the] Newby Photo Array in 2018." Richardson contends, "The evidence could not have been discovered or obtained by the exercise of diligence before the expiration of 21 days following entry of the final order of conviction." He further contends:

> The evidence upon which I based my claim is material and, when considered with all of the other evidence in the record, will prove that no rational trier of fact would have found me guilty or delinquent beyond a reasonable doubt of the charge(s) described above because had the evidence been available, my counsel would have never advised me to take a guilty plea.

Having concluded *supra* that Shannequia Gay's role as a witness in this case would have been revealed through the exercise of diligence by Richardson and his defense counsel, we likewise conclude that the exercise of diligence would have revealed the purported photo identification of a possible alternate suspect made by that very same witness, Shannequia Gay, later in the evening of the day that Officer Gibson was killed. Code § 19.2-327.11(A)(vi)(a). A "devoted and painstaking application" by counsel for Richardson to securing evidence from Shannequia Gay—who had already been subpoenaed to testify at Richardson's scheduled trial—necessarily would have involved also inquiring about any prior identifications that she may have made based on what she had seen at the time of the crime. *Tyler*, 73 Va. App. at 465; *Madison*, 71 Va. App. at 702 n.14. Here, the circuit court found, following the 2024 evidentiary hearing, that "Mr. Richardson has failed to meet his burden of showing his 'devoted and painstaking application' to obtain this evidence." Consequently, because we also find that Richardson has failed to prove that the photographs could not, by the exercise of diligence, have been discovered or obtained before the time that the conviction became final in the circuit court, the photographs do not satisfy the statutory preconditions necessary for the issuance of a writ of actual innocence. Code § 19.2-327.11(A)(vi)(a).

Like with Shannequia Gay's statement, Richardson has also failed to establish that the photographs or any purported identification of the perpetrator associated with those photographs are "material" within the

-44-

meaning of Code § 19.2-327.11(A)(vii) because Richardson did not actually prove who Shannequia Gay may have identified in the photographs—or if Shannequia Gay identified *any* individual as the actual perpetrator who killed Officer Gibson.

While testifying under oath at the 2024 evidentiary hearing, Shannequia Gay effectively answered, "I don't remember," when asked a number of questions about the photographs, including (1) whether she "was initially shown a single photograph by Detective Greg Russell on April 25, 1998"; (2) whether she "identified an individual in that photograph to the police as the perpetrator who killed Officer Gibson"; (3) whether she was "shown an array [of] photographs by Investigator Tommy J. Cheek on April 25, 1998"; (4) whether she "identified an individual from the photo array to the police who ran from the police as the perpetrator who killed Officer Gibson"; or (5) whether she "identified the man with dreads wearing a white T-shirt to the police as the perpetrator when shown photographs by the police on April 25, 1998?" After hearing her sworn testimony, the circuit court specifically found in its 2024 certified findings of fact that "Ms. Gay did not remember being shown a photograph" or "an array of photographs by police in 1998"—and that Shannequia Gay "could not answer whether she identified an individual" from "that photograph" or from "that photograph array to the police as the perpetrator who killed Officer Gibson" in 1998. The circuit court also found that Shannequia Gay "could not answer who she identified as the 'man with dreads' wearing a white t-shirt."

In addition to Shannequia Gay's sworn testimony, several members of law enforcement also testified under oath at the 2024 evidentiary hearing, including Tommy Cheek, who had been the lead investigator in this case for the Sussex County Sheriff's Office. Cheek recalled, "There was a young girl that was interviewed, but not by myself. Deputy Russell and one of [*sic*] Valerie Ricks interviewed her. I did not." However, Cheek did not remember the name of the "young girl," nor did he remember showing an array of photographs to her, noting that "she may well have been shown one but not by me." Furthermore, Greg Russell confirmed at the 2024 evidentiary hearing that he showed Shannequia Gay a photograph of a single individual for the purpose of "[i]nitially, trying to determine hairstyle of what she described in a statement."

-45-

Although Russell did not recall the hairstyle of the individual in that single photograph, when asked the identity of the individual in that single photograph, Russell stated, "Terrence Richardson." Russell also noted that the single photograph of Richardson "became part of my case file."[20] When asked about an array of photographs, however, Russell recalled that a photo lineup had been created, but he clarified that he "didn't make it." Terry Ann Stevens acknowledged at the 2024 evidentiary hearing that her initials were on "a photo lineup," but she stated, "I don't recall showing the photo lineup. My signature would be there if somebody identified something in the lineup." When asked whether she has "any independent recollection of any interaction that [she] had with that particular lineup," Stevens specifically stated, "I don't recall." The circuit court expressly found that Stevens "did not recall the photo array but identified her signature on it in open court"—and that Stevens "did not confirm the identity of any person that Shannequia Gay may have identified in a photograph presented to her on April 25, 1998."

As noted *supra*, for the sake of judicial economy, we will assume without deciding that we have the authority to grant Richardson's motion to expand the record and to consider all of the materials that he has now presented to us in that expanded record for purposes of this matter currently before us. Among the materials submitted by Richardson after the 2024 evidentiary hearing as part of the expanded record is a letter dated February 20, 2001, from then-Assistant U.S. Attorney David J. Novak to Richardson's federal trial counsel. The stated purpose of Novak's letter was to provide "additional information regarding the identification procedures involving Shanneq[u]ia Gay and to clarify the factual background for the

---

[20] In an August 20, 2021 interview with Kyle Richards (an investigator for then-Attorney General Mark R. Herring), Detective Greg Russell similarly stated that he "showed her [Shannequia Gay] a picture of *Terence Richardson* with the intent of determining whether his hair style resembled that of the person Shannequia saw at the apartment complex." (Alteration and emphasis added). Russell then told Richards that "Shannequia 'gasped' when she saw the photo of *Richardson* and told him that *he was the man she saw*." (Emphases added). Russell acknowledged to Kyle Richards, however, that he made a mistake in the photo identification process by initially showing Shannequia Gay a single photograph of Richardson in the first place. Furthermore, according to Kyle Richards's memorandum of his interview with Detective Russell, "Russell added that Jarrett Adams has a copy of the photo that he showed to Shannequia and the photo has been used on various newscasts as well." At the most recent oral argument before this Court, Richardson's counsel, Jarrett Adams, emphatically denied being in possession of that single photograph that Russell showed to Shannequia Gay and that Shannequia Gay purportedly stated was the man she had seen that day.

-46-

identification procedures." In referring to that February 20, 2001 letter, Richardson claims, "Novak twice informed federal trial counsel that Ms. Gay identified Leonard Newby in a single photo and in a photo array on April 25, 1998." However, contrary to Richardson's contention to this Court, Novak's letter referring to Shannequia Gay actually states:

> At approximately 9:30 p.m. on April 25, 1998, Sussex County Deputy Sheriff Greg Russell showed her a single photograph of Leonard Newby, an early suspect in the case who is a black male and has dread locks. *No identification was made* but she got afraid when shown the picture.

(Emphasis added). In that same letter, Novak wrote that Shannequia Gay "gave the following description of the black male" whom she saw "with something in his hands standing near where Officer Gibson was laying": "tall, skinny, dark skin, *corn rows haircut*, light beard, wearing a white t-shirt and long dark shorts." (Emphasis added). Indeed, in Richardson's own petition for a writ of actual innocence, he claims, "I wore my hair in *cornrows* at the time." (Emphasis added).

Novak's letter then goes on to state:

> At approximately 11:15 p.m. that same evening, Sussex County Deputy Tommy Cheeks compounded this error when he (along with VSP Special Agent Terry Stevens and Sussex County Deputy Valerie Patterson-Ricks) showed a photo spread to Ms. Gay that contained Leonard Newby's photograph in position 2. At that time, *Ms. Gay stated that the man that she saw near the fallen officer was not in the photo spread*. As she was being driven home by Sussex County Deputy Valerie Patterson-Ricks, Ms. Gay stated that she saw someone with "dreds" in the photo spread. Unsure if this referred to an identification, Deputy Patterson-Ricks took Ms. Gay to be interviewed by VSP Special Agent Terry Stevens, who then interviewed Ms. Gay alone. VSP Special Agent Stevens then showed Ms. Gay the same photo spread as Deputy Cheeks. Ms. Gay signed her name under the photo in position 2. *The officers are unclear whether this indicated any identification or whether it indicated that she recognized the photo from the earlier single photo identification process*. Indeed, there is no report regarding this process because *VSP Special Agent Stevens discarded any value to this identification process since it had been clearly tainted by the earlier individual photograph shown by Deputy Russell*.

(Emphases added).  Novak's letter plainly states that "[n]o identification was made" by Shannequia Gay when she was shown a single photograph purportedly of Leonard Newby[21]—and that when she was later shown a photo spread containing Leonard Newby's photograph, Shannequia Gay "stated that the man that she saw near the fallen officer was *not* in the photo spread."  (Emphasis added).  Although the February 20, 2001 letter indicates that Shannequia Gay signed her name under what Novak's letter states was Leonard Newby's photograph when shown the photo spread for a second time, the officers involved in the photo identification procedure were, in fact, "unclear whether this indicated any identification or whether it indicated that she recognized the photo from the earlier single photo identification process."  Indeed, according to Novak's February 2001 letter, Terry Ann Stevens specifically "discarded any value to this identification process since it had been clearly tainted by the earlier individual photograph shown by Deputy Russell."[22]

To the extent that Richardson contends that the evidence in the record points to Leonard Newby as the actual perpetrator, Richardson's own defense counsel, David E. Boone, testified under oath at the 2024 evidentiary hearing before the circuit court that there was "no third-party suspect" in this case as "[t]his case started out as a who done it and quickly morphed into a what did he [Richardson] do."  Furthermore, when asked at the evidentiary hearing whether Leonard Newby was ever a suspect in this case, the prosecuting attorney, J. David Chappell, testified, "I remember the name Leonard Newby just in general being in Sussex

---

[21] Greg Russell has repeatedly stated—most recently under oath at the 2024 evidentiary hearing before the circuit court—that on April 25, 1998, he personally showed Shannequia Gay a single photograph of *Terence Richardson*, not of Leonard Newby.

[22] As part of the expanded record, Richardson submitted a post-evidentiary hearing affidavit dated June 26, 2024, from Terry Ann Stevens, in which she states, "Having viewed Mr. Richardson at the evidentiary hearing, I am confident that the little girl (Shannequia Gay) did not identify him in the April 25, 1998, Photo Identification Lineup."  She further states, "The man that Ms. Gay identified was larger and had a hairstyle different from Mr. Richardson," and, "I know that I would not have signed my name to the April 25, 1998, Photo Identification Lineup shown to me at the evidentiary hearing unless a positive identification was made."  However, according to Novak's 2001 letter that counsel for Richardson has now submitted to this Court, Stevens herself "discarded any value to this identification process."  In fact, Stevens does not provide who Shannequia Gay may have identified in the photographs, and in her sworn testimony at the 2024 evidentiary hearing before the circuit court, Stevens did not recall interviewing or ever even investigating Leonard Newby in connection with the killing of Officer Gibson.

-48-

in law enforcement, but I don't have any specific recollection of his name as it involves this particular case. I do—I did know the name." Chappell clarified that he has "no recollection of anybody else" being identified as a suspect in this case other than Richardson and Claiborne.

In addition, Tommy Cheek, the lead investigator in this case, provided substantial sworn testimony about the status of Leonard Newby as a suspect in this case. When asked about Leonard Newby, Cheek replied, "I remember the name. We've had dealings with him." Turning to whether Newby was ever a suspect in the killing of Officer Gibson, Cheek stated, "I just recall that there was a lot of people that we were looking at and he was one of them." Cheek went on to recount that he later determined that Newby "didn't appear to be involved at all" in Officer Gibson's killing, and he confirmed that Newby "was eliminated during my investigation. And rather than spend a lot of time on somebody that we eliminated, I concentrated on the person who was the suspect, the people that were suspects." Cheek then explained that he ruled out Newby as a suspect "[t]hrough interviews and placing him at another place at that time, different investigations." Cheek did not remember who had provided him with that information, but he did remember that when "Newby said he was somewhere else," Cheek personally "went and talked to whoever and verified that he [Newby] was, in fact, was there." After observing Cheek's demeanor and sworn testimony at the evidentiary hearing, the circuit court found that although he "appeared physically frail, specifically suffering from mobility issues," Cheek nevertheless "remained mentally aware" and "was sincere, conscientious, intelligent, and his demeanor was indicative of truthfulness."

In short, having considered the totality of the record that Richardson has presented to this Court in support of his claim of innocence, we find that Richardson has failed to establish that the photographs and any purported identification of the perpetrator associated with those photographs are "material" within the meaning of Code § 19.2-327.11(A)(vii) of the actual innocence statute. We reach this conclusion for a number of reasons. Richardson has not shown who Shannequia Gay actually may have identified from the silhouettes that are all that are available to see in those photographs. Richardson has also not shown that, even if she actually did pick one photograph (when she was nine years old), she was doing so to identify

-49-

someone as the perpetrator who shot and killed Officer Gibson on April 25, 1998. Furthermore, while under

oath at the 2024 evidentiary hearing, Shannequia Gay made clear that she did not remember the police

interview of her or remember seeing any photographs (a single one or a photo array)—and thus did not

remember whether (or why) she may have even made any selections or identifications among any

photographs. Consequently, for all of these reasons, Richardson has simply not carried his burden of

satisfying the required statutory preconditions of diligence and materiality related to the photographs and the

purported identification of the perpetrator. Code § 19.2-327.11(A)(vi)(a) and (vii).

### C. The Purported 911 Call

As noted *supra*, Richardson states in his supplemental brief to this Court that he "withdraws" the

purported 911 call "from this Court's consideration" because "its veracity could not be substantiated" and

because "it does not meet all the criteria set forth in" Code § 19.2-327.13. Following the 2024 evidentiary

hearing, the circuit court specifically found that Richardson "presented little to no testimony or evidence

relating to" the purported 911 call and that he "has failed to meet his burden of showing his 'devoted and

painstaking application'" to obtain that evidence. The circuit court pointed out that not only did Richardson's

defense counsel, David E. Boone, testify that "he had no knowledge related to a 911 call from April 30,

1998," but that the prosecuting attorney, J. David Chappell, also testified that "he did not recall the 911 call

from April 30, 1998." The circuit court also pointed out that there was no testimony concerning "the origin

of the 911 call," "the identity of the caller from the 911 call," "the foundation of the caller's knowledge from

the 911 call," or even "the identity of the individual who received and transcribed the 911 call." Thus,

Richardson has, in fact, failed to show that the purported 911 call is "material" within the meaning of Code

§ 19.2-327.11(A)(vii)—i.e., that the contents of the anonymous 911 call are actually true. Therefore, for

these reasons, we also hold that the purported 911 call fails to satisfy the requirements of the actual innocence

statute.

### D. The Jury Verdict in the Federal District Court

Finally, to the extent that Richardson argues that the federal jury verdict acquitting him of murder satisfies "his statutory burden to assure this Court that a rational trier of fact would not convict" him of involuntary manslaughter in state court, we reiterate that the actual innocence statute requires Richardson to prove by a preponderance of the evidence that "*no* rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.11(A)(vii) (emphasis added). Indeed, Richardson is required under the statute to "prove that *every* rational factfinder would have" acquitted him of involuntary manslaughter—not merely that "some, many, or even most rational factfinders would have acquitted him" of that offense. *Tyler*, 73 Va. App. at 469 (emphasis in original). Thus, one factfinder's verdict on one offense (murder) simply is not sufficient to carry a petitioner's burden under Virginia's actual innocence statute for a completely different offense (involuntary manslaughter)—with different elements of the offense that needed to be proved.

In the U.S. District Court for the Eastern District of Virginia, Richardson was charged, in part, with violating 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 924(j)(1)—both of which concern killings that occur during drug trafficking. Under 21 U.S.C. § 848(e)(1)(B):

> any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this title or title III who *intentionally* kills or counsels, commands, induces, procures, or causes the *intentional* killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

(Emphases added). Under 18 U.S.C. § 924(j)(1), "[a] person who," during the course of drug trafficking, "causes the death of a person through the use of a firearm, shall" "be punished by death or by imprisonment for any term of years or for life" "if the killing is a murder"—which 18 U.S.C. § 1111, in turn, defines as "the unlawful killing of a human being *with malice aforethought*." (Emphasis added).

In the Circuit Court of Sussex County, by contrast, Richardson knowingly and voluntarily pleaded guilty to the felony offense of involuntary manslaughter—which is the state conviction that he now seeks to vacate in this matter. The Supreme Court of Virginia has defined "involuntary manslaughter" as "the killing of one *accidentally*, *contrary to the intention of the parties*, in the prosecution of some unlawful, but not felonious, act; or in the improper performance of a lawful act." *Noakes v. Commonwealth*, 280 Va. 338, 345 (2010) (quoting *Mundy v. Commonwealth*, 144 Va. 609, 615 (1926)) (emphasis added); *accord Brown v. Commonwealth*, 278 Va. 523, 528 (2009); *Dowden v. Commonwealth*, 260 Va. 459, 470 (2000). While Richardson's federal charges required proof of an *intentional* killing or a killing *with malice aforethought*, his state involuntary manslaughter charge required proof of an *accidental* killing. Therefore, the federal jury's verdict in the U.S. District Court for the Eastern District of Virginia that Richardson was not guilty of an *intentional* killing or a killing *with malice aforethought* simply would not prove that Richardson is actually innocent of the *accidental* killing to which he pleaded guilty in the Circuit Court of Sussex County. Consequently, for all of these reasons, Richardson's federal acquittal for murder fails to establish that *no* rational factfinder would have found him guilty of involuntary manslaughter, as required by Code § 19.2-327.11(A)(vii) of the actual innocence statute.

In short, upon review of the entire record before this Court, we certainly cannot say "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that *no* rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.11(A)(vii) (emphasis added). Therefore, because Richardson has failed to establish that he has satisfied each of the statutory requirements of Code § 19.2-327.11(A), we hold that he has simply failed to satisfy his required burden of proof under the actual innocence statute.

### III. CONCLUSION

While Richardson relies heavily on Shannequia Gay in his petition for a writ of actual innocence, Shannequia Gay testified under oath at the 2024 evidentiary hearing before the Circuit Court of Sussex

-52-

County that she has no recollection whatsoever of any of the events that occurred on April 25, 1998, when she was just nine years old—including any statement that she may have made to the police at that time or any photograph identification procedure in which she may have been involved at that time. Indeed, Shannequia Gay, while under oath at the 2024 evidentiary hearing, stated that she does not remember making the statement to police that Richardson now relies on in his petition for a writ of actual innocence. In addition to not vouching for that statement, she also does not remember identifying anyone in any photograph or any photo array—as she does not remember being shown photographs or even being interviewed by the police.

Despite her lack of recollection now, however, the record is nevertheless clear that Shannequia Gay was known both to the prosecution and to the defense as a potential witness in Terence Richardson's case before his scheduled trial in December 1999. The extensive record before this Court establishes that Shannequia Gay had been subpoenaed by the prosecution in November 1999 to testify at Richardson's scheduled trial—*before* Richardson elected to enter a guilty plea to involuntary manslaughter in December 1999 and *well before* Richardson's conviction became final in March 2000. Furthermore, David E. Boone, whom Richardson had retained as his defense counsel, testified under oath at the 2024 evidentiary hearing before the circuit court that Shannequia Gay "had been developed as a potential witness" in this case and that Boone had directed his investigator, Jack Davis, "to talk to the parents in interviewing the child" because Boone "wanted to know what identification that child could make." Boone also confirmed under oath that the prosecution "was very forthcoming with discovery" and that he had no reason to believe that J. David Chappell, the then-Commonwealth's Attorney of Sussex County who prosecuted Richardson's case, had withheld any documents from him related to this case. Under these circumstances, Richardson has failed to prove, as required by the actual innocence statute, that the evidence related to Shannequia Gay is such as could not, by the exercise of diligence, have been discovered or obtained before the time that the conviction became final in the circuit court. Code § 19.2-327.11(A)(vi)(a).

In addition, Richardson has failed to establish the truth of the contents of Shannequia Gay's purported statement to the police on the evening of April 25, 1998—or the identity or the purpose of any purported

-53-

identification that Shannequia Gay may have made to the police when shown photographs that same evening. Greg Russell, who was a detective in the Sussex County Sheriff's Office and assisted with the investigation into the killing of Officer Gibson, testified under oath at the 2024 evidentiary hearing that he wrote down Shannequia Gay's statement about what she had witnessed on April 25, 1998. Russell made clear, however, that he has no personal knowledge about the contents of her statement. Russell also testified that he showed Shannequia Gay a single photograph of Terence Richardson on the evening of April 25, 1998. According to a 2021 memorandum from Kyle Richards (an investigator for then-Attorney General Mark R. Herring), Russell provided that same information to Kyle Richards in 2021 and also told him that "Shannequia 'gasped' when she saw the photo of Richardson and told him [Russell] that he was the man she saw." Terry Ann Stevens, who had been a special agent with the Virginia State Police, acknowledged at the 2024 evidentiary hearing that her initials were on "a photo lineup." However, Stevens clarified, "I don't recall showing the photo lineup. My signature would be there if somebody identified something in the lineup." According to a 2001 letter from then-Assistant U.S. Attorney David Novak to Richardson's federal trial counsel, Stevens herself "discarded any value to this identification process since it had been clearly tainted by the earlier individual photograph shown by Deputy Russell." Regardless, the 12 photographs (in black and white) that are purportedly the "photo lineup" show only the silhouettes of a head and upper torso of a person, but they do not actually show any individual facial features or other identifying characteristics.

Furthermore, to the extent that Richardson points to Leonard Newby as allegedly Officer Gibson's actual killer, Richardson's own defense counsel, David E. Boone, testified under oath at the 2024 evidentiary hearing that there was, in fact, "no third-party suspect" in this case as "[t]his case started out as a who done it and quickly morphed into a what did he [Richardson] do." Similarly, when asked at the 2024 evidentiary hearing whether Leonard Newby had ever been a suspect in this case, the prosecuting attorney, J. David Chappell, testified, "I don't have any specific recollection of his name as it involves this particular case." Chappell also testified that he has "no recollection of anybody else" having been identified as a suspect in this case other than Richardson and Richardson's co-defendant, Ferrone Claiborne. The lead investigator in this

case, Tommy Cheek, testified under oath at the 2024 evidentiary hearing that Leonard Newby "didn't appear to be involved at all" in Officer Gibson's killing. In fact, Cheek confirmed that Leonard Newby "was eliminated during my investigation" as a suspect in this case "[t]hrough interviews and placing him at another place at that time, different investigations." Cheek specifically recalled that when "Newby said he was somewhere else," Cheek personally "went and talked to whoever and verified that he [Newby] was, in fact, was there." Moreover, Richardson himself has now abandoned any reliance on a purported 911 call supposedly identifying Leonard Newby as a suspect—as Richardson has presented no evidence to show why that piece of purported evidence actually supports his claim of innocence. Under these circumstances, therefore, Richardson has also failed to prove, as required under the actual innocence statute, "that the previously unknown, unavailable, or untested evidence is material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt." Code § 19.2-327.11(A)(vii).

It is well-settled that "Chapter 19.3 of Title 19.2 of the Code of Virginia provides both the authority and the statutory boundaries given by the General Assembly for granting a writ of actual innocence." *Brewer*, 82 Va. App. at 691 (quoting *Waller v. Commonwealth*, 70 Va. App. 772, 775 (2019)). For all of the foregoing reasons, because Richardson's petition for a writ of actual innocence simply does not satisfy the requirements of the actual innocence statute, this Court cannot grant him the relief he has requested. Consequently, we hold that Richardson is clearly not entitled to the writ, and we dismiss his petition.

We direct the Clerk of this Court to send copies of this order to Richardson's counsel, to the Attorney General, and to the Commonwealth's Attorney of Sussex County.

This order shall be published.

A Copy,
Teste:

A. John Vollino, Clerk
*original order signed by a deputy clerk of the*
By: *Court of Appeals of Virginia at the direction*
*of the Court*
Deputy Clerk

-55-